STATE OF MINNESOTA v. WILLIAM IAGO.[1]

November 19, 1896.

Nos. 10,293—(44).

**Rape—Sufficiency of Evidence.**
> Evidence examined, and *held* insufficient to sustain the verdict of guilty of rape.

Appeal by defendant from an order of the district court for Renville county, Webber, J., denying a motion for a new trial. Reversed.

*McClelland & Tifft* and *R. T. Daly*, for appellant.
*H. W. Childs* and *Geo. B. Edgerton*, for respondent.

BUCK, J. On April 21, 1896, the defendant, Iago, was tried in the district court of Renville county, and by a jury convicted of the crime of rape. The indictment charged him with having on August 13, 1895, feloniously and forcibly ravished and had sexual intercourse with one Hedwig Doepke, against her will and without her consent, and that he then and there forcibly overcame her resistance, she being then and there a woman above the age of 18 years, and not the wife of Iago.

The prosecutrix, at the time of the alleged offense, was an unmarried woman, 20 years old, weighing 90 pounds, living with and working as a domestic in the family of a farmer named Edward Hanna, who resided in Renville county, in this state. The defendant was a farmer weighing about 125 pounds, 50 years old, residing about one mile and a half from Hanna's, whose daughter he married; and upon her death he took his young daughter, some 6 years old, to live with her grandparents, the Hannas, and where he visited quite frequently prior to the time of the alleged offense, and where, the previous fall, he became acquainted with the prosecutrix at the time she commenced work for Hanna, and where he met her occasionally. They were on friendly terms with each other until the time of the alleged offense, August 13, 1895, at which time she alleges he committed the crime charged, one Sunday, in the daytime, at the house of Hanna, while the family were at church.

---

[1] Reported in 68 N. W. 969.

On the trial, the prosecutrix testified, upon cross-examination, that on July 28, 1895, she had sexual intercourse with the defendant, and that she told no one and made no complaint about it until after the time of the alleged rape. Of the latter offense she made complaint to Mr. and Mrs. Hanna, upon their return home from church, a few hours thereafter. The defendant was sentenced to five years' imprisonment in the penitentiary, the shortest period allowed by law.

In view of the extraordinary character of the evidence in behalf of the state, and its contradiction on the part of the defendant, and the heinousness of the offense charged, we deem it our duty to carefully scrutinize the evidence. First, then, as to the sexual intercourse between the parties prior to the time of the date of the offense alleged in the indictment. Upon her cross-examination she testified as follows:

"Q. Well, his little girl was making her home with Edward Hanna and his wife? A. Yes, sir. Q. Didn't he frequently come there to visit his little daughter? A. Yes, sir; he came there sometimes. Q. So that you had met him a good many times before this 13th day of August, did you not? A. Yes, sir; I did. Q. Had you had sexual intercourse with the defendant, William Iago, before this 13th day of August, 1895? A. Yes, sir. * * * Q. How long before this 13th day of August had you had sexual intercourse with the defendant? A. The 28th of July. Q. Was that at Edward Hanna's also? A. I don't understand you. Q. Did you have sexual intercourse with the defendant on the 28th of July, 1895, at Edward Hanna's house? A. Yes, sir. * * * Q. Now, you didn't tell anybody about that, did you? A. No; not on that day. Q. Not until after this 13th day of August, did you? A. Yes, sir; in the evening on the 13th of August. Q. That was the first time that you spoke about what occurred between you and the defendant on the 28th day of July, isn't it? A. Yes, sir. Q. Now, your people lived during this time how far from Edward Hanna's, where you lived? A. A mile and a half. Q. And your brother lived how far away * * * from Mr. Edward Hanna's place? A. A mile and a half."

Upon redirect examination she, being examined by the prosecuting attorney, said:

"Q. Now, Mr. McClelland asked you if you told about the first time that the defendant had sexual intercourse with you, the first time, that time in July, was it with or without your consent? A. It was without my consent. Q. You resisted it that time? Mr. McClelland: Wait, I object to your testifying. Q. Well, did you or did you not resist it then,—try to get away? A. Yes, sir; I did. Q. Well, why didn't you tell about it the first time? * * * Q. You

may explain, if you know.　I will ask you to explain why you didn't complain when he did it the first time, if you know,—in July, you say, that he had connection with you then; why didn't you make complaint that time?　A. They was making me afraid that I should say nothing about—　Q. What?　A. They was making me afraid that I should say nothing—　By the Court:　Who was making you afraid?　A. Mr. Iago.　Mr. McClelland:　Mr. who?　Q. The defendant here, you mean?　A. Yes, sir."

This is all the material evidence bearing upon the question of her sexual intercourse with defendant on July 28, 1895, about two weeks prior to the time charged in this action.　There is but a slight trace of resistance to be found in this evidence, and this testimony seems to have been drawn out by leading questions put by the prosecuting attorney.　What she said or did to resist him she does not say, and what he did in the way of force is not stated.　Her assertions or conclusions are not based upon any substantial fact, and, whatever the facts were, they do not appear to have been deemed by her serious and violent enough to induce her to complain about them to any person.　At the time of the intercourse August 13, she says that she yelled and cried, but nothing of this kind appears to have taken place the first time.　Therefore, according to her own evidence, she must be deemed to have finally consented to the first sexual intercourse, or, at least, did not resist with any great degree of physical effort or reluctance.　The defendant swears that on that day he had sexual intercourse with her twice, with her consent; that she was as willing as he was; and that, before and after the first time, she came where he was, and sat upon his knees.　She did not deny the latter part of this statement in giving her evidence.

Here, then, is a woman, confessedly impure in her sexual relations with the defendant, charging him with having two weeks thereafter committed rape upon her person.　Such a thing is by no means impossible, but the conduct of these parties towards each other on July 28 has a material bearing as to their sexual relations on August 13.　There is not the slightest reason given why she should consent at one time, and resist the next.　They were on friendly terms during the interval.　Hence, in testing the evidence of force or consent on August 13, we must do it in the light of what took place between them on July 28.

This brings us to an analysis of the evidence of what took place at the date of the offense charged. The defendant admits that he had sexual intercourse with her that day, but denies that he used force in so doing. The controversy is, therefore, not as to intercourse in fact, but as to whether force was used by defendant, and without the consent of the prosecutrix. The material and substantial part of her evidence upon this point upon direct examination is as follows:

"Q. When was the first time that you saw the defendant that day? Where was it, and when? A. It was in the house, between 11 and 12 o'clock. Q. Did you see him before he got to the house,—got into the house? A. No, sir; I did not. Q. When he came in the house, what did he say or do? A. After he came in the house? Q. At that time. A. He said 'if I was home alone,' and I said, 'Yes,' and then he said he was after the sledge there, and I told him I didn't know if the sledge was there or not. Q. Well, what else was said or done? A. And then he took hold of me; took hold of me with his right hand on my left arm, and I asked him what he was going to do, and he looked at me; and I—and I—tried always, and all I could, and as much as I could, to get away from him, and then he took hold of me with both his hands on both my arms; and—and he pushed and carried me along to the lounge, and I was yelling and trying as much as I could, trying to get away from him. Q. What did he do when he took you to the lounge? A. Then he— I told him to leave me alone; if he didn't, I know what I have to do. And so he—so he sat—let go of me again, and sat down on the chair; and I was so scared and excited and I didn't know— I couldn't move, and, if I tried to make a move for the door, he jumped up again, and pulled and carried me along to the lounge. Q. Well, this that you speak of now was what he did before he took you to the lounge, was it? Q. My question was this: What did he do when he took you to the lounge? A. When he got me onto the lounge, he lift up my clothes, got up with his knees on my knees, and took my both hands, and squeezing me down like this [indicating], and then he unbuttoned his pants, and put his private parts into mine. Q. Well, what did you do then? A. I yelled and cried and tried all I could and always, and done as much as I could to get away from him. Q. How long did you try to get away from him,—just when he first threw you down? A. All the time, as long as he was on top of me, I tried. Q. Well, did he— He had intercourse with you then, did he? A. Yes, sir.

"Q. What was done after that? A. After he— After that he went out to look for the sledge. Q. Where did he go? A. He went out around the granary that way, to look for it. Q. What did you do? A. I was in the house. I was on the lounge. I got pain all over, and was so scared and excited, I could not work and make nothing. And after a while I got so scared, I thought he might come in

again, and do such a thing again to me. So I took a pail of water that was standing outside the door there, and threw it out, and went around by the bench by the kitchen, and thought I try as though I look for the sledge; so when he come back, and try to do such a thing to me again, I tell him I couldn't find it. Q. Did you see him outside? A. Yes, sir; I saw him. Q. Did you have any talk with him? A. No; when he came up to the kitchen, I told him, I done look for the sledge, and tell him I couldn't find the sledge; and then I told him I didn't know if the sledge was there or not. Q. Anything else that you told him, say anything else, where it might be? A. And I said it may be that the sledge was up to Mr. Jim Hanna's place. Q. Well, what did you do after that? What was done after that? A. After he went away, I went in the house again, and after a while, when he was gone, I went out to see where he went, if he was there yet, or if he was hiding himself in the trees, to come back again; and so I looked, and I see him just going into Mr. Jim Hanna's trees there. Q. Whereabouts is Mr. Jim Hanna's place from Edward Hanna's place? How far is it? A. It is a quarter of a mile, as far as I know. Q. Which direction, if you know? North, east, south or west? A. Southwest. Q. Now, did he return there again that day? A. No, sir, he did not. Q. Where did you go? A. I went into the house then again, when I saw he was going into Mr. Jim Hanna's trees there. Q. Was anybody there shortly after he went away? A. No, sir. Q. When did Mr. Hanna's folks come back, the old gentleman's folks? A. It was between 8 and 9 o'clock in the evening. Q. Was it daylight or dark? A. No, sir, it was dark. Q. What, if anything, did you say to Mr. Hanna's folks after they came back? A. I told Mr. Hanna about it, that he was there after—that he— Mr. McClelland: Well, wait; I object to her telling the particulars; I think she has told sufficient that she is permitted to. By the Court: I think that is correct. Q. Did you say anything to Mrs. Hanna about it? A. Not at first. I told the old man, Edward Hanna, first. Q. Whereabouts was he when you told him first? A. I just took out the lantern where he was with the team and helped him unhitch the horses. Q. You told him when you were unhitching? A. Yes, sir. Q. Well, did you say anything to Mrs. Hanna about it? A. Yes, sir; after the old man Hanna, he was calling her in, and they commenced to talk, and then I told her about it. Q. Did you tell anybody else that evening? A. Not that night, not the 13th. Q. How soon afterwards? A. Yes, sir. Q. When, if at any time, did you tell anybody else? A. It was on the 14th, in the evening. Q. That was the next day? A. Yes, sir; next day after this. * * * The next day, 14th of August, in the evening, I went home, and told my brother about this. Q. Did you tell any one else at that time? A. Yes, sir; then I went down to—to my uncle, and to see my father and mother. Mr. McClelland: When was that? A. At the same time, on the 14th of August, in the evening, to see my father and mother, and told them about that. By the Court: Told your father and mother? A. Yes, sir; I told

them about that. Mr. Miller: And her brother and uncle. By the Court: She didn't say. Her father and mother, she said. Q. What was your answer in reference to that? Did you tell your father and mother? A. Yes, sir; and my uncle, too. I told him, too. Q. I want to know if you understand me. Did you say you told your brother? A. Yes, sir. Q. And your uncle? A. Yes, sir. Q. Did you tell any one else? A. Yes, sir; and I told my father and mother. Q. How far is your brother's place from Edward Hanna's? A. It is a mile and a half. Q. Well, you told all these persons on the evening of the 14th, did you? A. Yes, sir. Q. When did you next see the defendant, if at all, and where? A. I see him on the 14th of August, in the morning, up at his place. Q. How did you come to see him then? A. Mr. Hanna, he took me up there. Q. How? A. I and Mr. Hanna, he took a team in the morning, and I and Mr. Hanna and the old lady, we went up there, and we took Mr. Mike Thompkins along. Q. For what purpose, if you know, did he take you up there? .A. He took me up there to—to tell him he shouldn't come around any more. A. Well, was there anybody else along with you besides Mr. Hanna and his wife? A. And the little girl and Mr. Mike Thompkins. Q. Mike Thompkins? A. Yes, sir. Q. Did he go with you from Mr. Hanna's place? A. No, sir; we went up there, and we stopped on the road at Mr. Mike Thompkins'. He was out in the yard, and he got a pail in his hands, and we walked out on the road, and we stopped at Mike Thompkins' place, and— Q. Well, go on. A. And he was winking at him, and was asking him if he got time— Mr. McClelland: What was that? A. He was winking at him. Mr. McClelland: Winking at whom? A. Mr. Edward Hanna at Mr. Mike Thompkins. Mr. McClelland: Now, I don't understand it. Was Mr. Hanna winking at Mr. Mike Thompkins? Is that what you mean to say? A. Yes, sir."

Upon cross-examination she testified that, when she told Mr. and Mrs. Hanna what had taken place between her and defendant, she was crying. Upon this point, and her conduct when she first met them on their return home, Mr. Hanna, a witness for the state, testified as follows:

"Q. Well, what, if anything, did you do in regard to the matter after she made complaint to you? A. Well, I didn't do nothing until the next morning. I hitched up the team, and drove up to Iago's after that. Q. Who went with you? A. My wife and Hedwig. Q. Did Hedwig ask you to go? A. Well, she did not. Q. She did not? A. She did not ask me to go. I felt a little concerned about it myself, to think that anything be wrong about the house when I leave it, till I come back."

Upon cross-examination he testified as follows:

"Q. Did the defendant, Mr. Hanna, and the girl Hedwig, have a quarrel there? A. Well, not much of anything. He said he had

nothing to do with her, and she claimed he did.    Q. Well, now, re-
curring again to the 13th, the evening of the 13th; when you and
your wife came home with the team, she met you out to the barn?    A.
She met me out in the yard; yes, sir.    She heard us coming, and
brought out the light.    Q. Did she act any different on that occasion,
so far as you know, from any other occasion?    A. She did not.    Q.
Was she crying?    A. She was not, to my knowledge."

The defendant sharply contradicted all statement of force upon his
part towards the prosecutrix, stating that he went to Hanna's to pro-
cure a sledge; that the kitchen door was open when he got there;
that he was sitting on a chair, and she sitting upon his knee; that
he asked her if she would consent to have intercourse with him, that
she walked over to the lounge, she going ahead, and he followed her;
that she lay down on the lounge; that he did not carry or push her
to the lounge; that she was willing to go there herself; that she did
not cry or make any noise; that he remained on the lounge some con-
siderable time, and had sexual intercourse with her, with her consent;
that afterwards he sat on the chair again, and she came over where he
was, and sat upon his knee, and in about an hour she went over to
the lounge again, and lay down upon it herself, and he then had in-
tercourse with her the second time; that, between the first and sec-
ond acts of intercourse, she sat upon his knee all the time, except
when she would get up and go to the door, which was open, and see
if the Hannas were coming, and then go back, and say no one was
coming; that she did not cry on either occasion, nor attempt to go
away, or into any other room, and was as willing as he was at both
times to have sexual intercourse; that he never threatened her in
any way, or used any force; that, when he started to look for the
sledge, she said she would go, too, and accompanied him part way,
and he told her there was no need of it, and, just before he started home,
he had a conversation with her about the vegetables in the garden.

Mr. Bregal, a witness for the defense, testified that, on the prelimi-
nary examination in justice's court, he was the interpreter, and she
then swore that the door was open when defendant came there; that,
when she lay down upon the lounge, she lay there quietly during the
entire time that the defendant was on top of her; that she then had
shoes on; that she said defendant was on top of her about an hour,
but changed the time, saying pretty near half an hour; that, after
she had intercourse with defendant on the 13th day of August, she

went out with defendant, hunting for the sledge hammer; that before August 13th she had sexual intercourse with defendant; and that they were good friends until that date. Upon cross-examination, he testified that he interpreted all of her evidence, and did not recollect that she said she was trying all the time to get away from defendant.

Mr. O'Hara, a witness for defendant, testified that he was present at the preliminary examination, and heard the testimony of the prosecution; that she then swore that she had on shoes; that, when she reached the lounge, she lay there quietly during all the time that defendant was on top of her; that, shortly before August 13th, they had sexual intercourse with each other; that she went out with defendant, looking for the sledge, after she had intercourse with him on the 13th of August; that part of the time between the time when she started for the lounge and when he got through he was laughing; that she did not say she was angry.

We have thus given the evidence quite fully, because of the gravity of the case. Her own admissions show that, at the time of the alleged offense, she was not a "virgin of uncontaminated virtue," although this would not justify the plaintiff in committing a rape upon her, even if he had previously had connection with her; but it was competent evidence as tending to show the improbability of her resisting, or that the resistance was very slight. It is much more probable that a woman having admitted sexual connection with a man with whom she had done so on a previous occasion did not resist than if such previous intercourse had never taken place. It is sometimes difficult in actions of this kind to distinguish between the motives of a mercenary woman and the uncontrolled lust of a brutal man. Next to murder it is one of the most abhorrent of crimes, but the prosecutions are sometimes attended with danger, for malice and private vengeance have their victims, as well as womanly purity its violators.

Now, examining this evidence, we find that the prosecutrix testified without reluctance that she had intercourse with defendant about two weeks before the date of the alleged offense. The burden of proving beyond a reasonable doubt that her resistance on the second occasion was not a pretense, but a decided objection, made in good faith, rested upon the prosecution. She was a woman of full age, in the possession of her physical and mental faculties, accustomed to do farm

as well as household work, and there was no threat of physical violence on his part towards her to accomplish his purpose. Her garments were not torn or ruffled at all, and there were no outward indications of any violence or force on his part, or of the slightest resistance on the part of herself. She says that she yelled and cried and tried to get away from him. That is substantially the gist of her testimony. Her yelling does not appear to have been a call for help. She did not ask him to desist, or threaten to expose him or prosecute him, and did not speak to him during the whole time of this transaction. According to her own testimony, she did immediately thereafter talk with him about finding the sledge, and assisted him in doing so. Would a pure woman, upon whom had just been committed one of the most aggravated of human offenses, thus voluntarily talk with and assist the author of such a criminal outrage? It is elementary that force is a necessary element in the crime of rape, and where the woman is in the possession of her full mental and physical faculties, unawed by threats or fear, her reluctance and resistance must be bona fide and decided. Her evidence does not show that she resisted to the extent of her ability.

Outside of the admission made by the defendant of actual intercourse between them, the only evidence corroborating that of the prosecutrix is the fact that she made complaint that same evening to her employers, Mr. and Mrs. Hanna; but it is quite remarkable that she then made no complaint about the previous intercourse, had two weeks before, with the same defendant. She says that, when she made complaint to the Hannas, she was crying. But Mr. Hanna testifies that her voice was the same; that she looked as at other times; that there was no appearance of a struggle on her clothes or person; that she did not complain of being hurt in person, or that her clothes had been torn; and that she was not crying. The record presents conduct on the part of the prosecutrix which is inexplicable when viewed upon the theory that the act was committed by force and against her will. Her own testimony and conduct show the improbability of the charge, and stand uncorroborated except in the particulars we have mentioned. To this should be added her own admission of previous intercourse, and the impeaching testimony of the other witnesses upon the question of her conduct and testimony. In our opinion, the testimony is insufficient to establish the proof required by law, viz. proof

of the commission of the offense beyond a reasonable doubt.    See State v. Connelly, 57 Minn. 482, 59 N. W. 479; Matthews v. State, 19 Neb. 330, 27 N. W. 234.

Order reversed, and new trial granted.