## STATE v. JAMES McLARNE.[1]

January 15, 1915.

Nos. 18,527—(2).

**Criminal law — conviction based on confession.**

1. Our statute provides that a confession of defendant shall not be suffi-

---

[1] Reported in 150 N. W. 787.

Note.—The general question of *corpus delicti* in arson is treated in a note in 16 L.R.A.(N.S.) 285. And upon the proof of *corpus delicti* in arson, see note in 68 L.R.A. 41, 49, 55, 69, 71, 78.

cient to warrant his conviction without evidence that the offense charged
has been committed.

**Arson — evidence insufficient.**

   2. The *corpus delicti* in arson, the crime of which defendant was con-
victed, requires proof not alone of the fact that the building burned but
also that the fire originated through criminal agency. Excluding the claimed
admissions or confessions of defendant, the evidence is insufficient to prove
that the crime of arson was committed.

Defendant was indicted by the grand jury of Le Sueur county,
tried in the district court for that county, convicted of the crime of
arson, and sentenced to the State Prison for a term not to exceed seven
years. From an order, Morrison, J., denying his motion for a new
trial, defendant appealed. Reversed and new trial granted.

*Charles C. Kolars* and *Thomas J. McDermott,* for appellant.

*Lyndon A. Smith,* Attorney General, *John C. Nethaway,* Assist-
ant Attorney General, and *Francis J. Hanzel,* County Attorney, for
respondent.

HOLT, J.

In February, 1913, defendant was convicted of the crime of arson.
He is now serving the sentence imposed. The appeal is from the
order denying a new trial, and involves but one assignment of error,
namely, that the verdict of guilty is not justified by the evidence.

At about 11 o'clock on the night of July 6, 1911, fire was discov-
ered in a barn on the farm of Adna Pettis, located 2½ miles south-
east of St. Peter, Minnesota. About one year thereafter defendant
was indicted on the charge that he set the fire. The following facts
give a setting to the case: Less than a year prior to July 6, 1911,
defendant drifted into the farming community near St. Peter. He
was about 35 years of age. He worked for and paid court to a widow
upwards of 82 years old, who lived upon and owned a 40-acre farm,
nearly a mile west of Pettis' barn in a direct line. This widow was
the mother of Mrs. Pettis. Mr. Pettis was not then living with his
wife. Mr. Pettis opposed defendant's intended marriage, how vig-
orously does not appear. Another married daughter of the old lady,
a Mrs. Deubler, with her two grown children, a son and daughter

arrived from Texas in June to pay the mother and grandmother a visit —the first one the daughter had made to her mother in 50 years. Reading between the lines, it might be inferred that they came in response to a message from Adna Pettis, for the purpose of defeating defendant's matrimonial scheme. But it seems that they arrived so late that their efforts, if any, were futile, for defendant was married on June 15. So far as disclosed by the record there was no bad feeling between Adna Pettis and defendant subsequent to the marriage and prior to the destruction of the barn. In fact, whenever they met in town they treated each other and observed the usual courtesies of friends and relatives. Defendant's newly acquired daughter from Texas and her daughter stayed at defendant's house, and Mrs. Pettis also came there and visited her mother and half-sister, Mrs. Deubler. The Deubler visit was not enjoyed, for on July 7 defendant told Mrs. Deubler and her daughter that he did not desire any "Texas trash" in the home, and his wife seemed equally emphatic in her wish that this daughter and her children should not again darken her doors. In the quarrel on July 7 Mrs. Deubler openly accused defendant of setting fire to the barn. The next day she and her children departed for Texas. Young Mr. Deubler was stopping with Adna Pettis, and on the afternoon of the seventh of July he was seized with a desire to do detective work, and explored a cornfield, lying between defendant's home and the barn, for tracks. He did not look for tracks in any other direction. At the time of this trial there were pending two actions instituted against defendant and his wife by Adna Pettis, as administrator of the estate of Mrs. Pettis, she having died some time after the barn was destroyed. The purpose of the actions, as far as disclosed, seems to be to deprive defendant's wife of the 40-acre tract upon which was the home and also to acquire some of the personal property which the old lady and defendant claimed to own.

Pettis' barn was but a few feet from a much traveled road. It had wide doors opening thereon, so that loads could be driven right in on the floor. One load of hay had been driven in, and the fire was first discovered about 11 o'clock in this hay by a person passing on a bicycle, and the alarm given. Mrs. Deubler and her daughter

testified that it was after half past ten when they went upstairs to their bedroom in defendant's home on the evening in question. That about 15 minutes thereafter, and before retiring, they saw defendant pass from his bedroom, past their door, and downstairs, with his shoes in his hands; that they heard the door slam downstairs; and that he walked away upon a plank below their window in the direction of the barn. They did not hear him return. Mrs. Pettis was then in the front room downstairs. Young Mr. Deubler, and those whom he called to 'notice the tracks in the cornfield, testified that they found tracks of a number 7 or $7\frac{1}{2}$ shoe going westerly from the direction of the barn towards defendant's home, and also the same kind of tracks going easterly and about a few rods distant from the first. The cornfield was some little-distance from the road and barn. No other tracks were found by them, except the imprint of one shoe in a meadow nearer defendant's house, but about half a mile therefrom. Defendant testified that he never wore a larger shoe than a six and he exhibited the shoe to the jury. Two other persons testified that, in hurrying to the fire that night, they crossed the same cornfield not far from where Deubler stated he found the tracks. So far the evidence is of the flimsiest kind, altogether insufficient either to prove that a crime was committed or to connect defendant therewith.

One Swenson, a hotel keeper at St. Peter, testified that in the latter part of June, 1913, he met defendant, who accounted for his dressed-up appearance by stating that he was just married. The two struck up a gossipy conversation, wherein Swenson asked defendant if he knew Adna Pettis, reputed to be well fixed. Defendant answered that he knew him very well, and afterwards in the talk said Pettis' "wealth might be reduced to a certain extent before long." That after the fire Swenson again saw defendant across the street in St. Peter, and he came over, on Swenson's motioning to him. Swenson then spoke thus: "You seems to be wise; that happens what you said." The defendant answered: "I told you it might happen." There is also a statement made by defendant, almost a year after the fire that Adna Pettis was his enemy.

Then there is an alleged admission testified to by Adna Pettis and his son. It seems that some time in June, 1912, Adna Pettis em-

ployed one Kaveny, who had been on the police force in Minneapolis, to obtain evidence against defendant. Kaveny apparently got into the good graces of defendant, drank and visited with him. On the evening of June 29, Pettis and son were in St. Peter, so were Kaveny and defendant. They all had drinks together. About 11 o'clock Pettis and his son were going into the saloon for more beer when they saw Kaveny and defendant coming around the corner. The former stepped into a dark alley for the purpose of hearing the conversation of the detective and defendant. Defendant's horse was tied near the sidewalk by the alley. As the horse was being untied by Kaveny, the father and son testified to hearing the defendant say to the detective: "The neighbors are telling me that you are a detective, and my wife is worried about it, but, of course, I told you I burnt Pettis' barn, but I think I can trust you. You say you are an Irish Catholic, and I don't think you will give me away to that A. P. A. Adna Pettis. If you do, I'll shoot you. I carry a loaded gun." Kaveny was at the trial, but was not placed on the witness stand.

The defendant denied that he left his home on the night of the fire, denied the conversation with Swenson, and also the alleged talk with Kaveny, and absolutely denied all connection with the burning of the barn.

Our statute, section 8462, G. S. 1913, provides: "A confession of the defendant shall not be sufficient to warrant his conviction without evidence that the offense charged has been committed." It would seem that outside of the alleged admissions of defendant there was no evidence that the burning of the barn was the result of the criminal intent of anyone. The law is that in arson cases there must not only be shown that the building burned, but that the fire was wilfully set by someone. Nowhere in the charge was the proposition presented to the jury whether the evidence established the *corpus delicti* apart from the defendant's admission or so-called confession. In fact the only reference thereto is found in this sentence which appears to assume that the destruction of the barn was caused by crime: "Now, gentlemen, it is established here upon the trial that the building of Adna Pettis was burned by someone, or burned, at least; and the

question arises as to whether or not the defendant is guilty of setting fire to such barn." As stated above the barn was adjacent to a much traveled road. A tramp or wayfarer may have accidently started the fire. Cases of spontaneous combustion are not unknown. The record does not disclose any plausible motive on the part of defendant to harm Pettis at the time the barn burned. While animosity then existed towards Mrs. Deubler and daughter, there is nothing to show anything but a friendly feeling toward Mrs. Pettis who was then stopping with defendant. It also appears from Mr. Pettis' testimony that, although he at first opposed defendant's marriage, he congratulated him when it did come off, and there was no enmity between them in July, 1911. The passing remark to Mr. Swenson made prior to the fire does not rise to the dignity of proof that the origin of the fire in the barn was the criminal act of defendant or anyone else. Subsequent statements by defendant are but admissions or confessions, and do not tend to supply the evidence demanded by statute. The following authorities sustain the proposition that, to prove the *corpus delicti* in arson, it is necessary to show not only that the building burned, but that the fire was designedly set by someone. People v. Wagner, 71 App. Div. 399, 75 N. Y. Supp. 950; Williams v. State, 125 Ga. 741, 54 S. E. 661; Brown v. Commonwealth, 87 Va. 215, 12 S. E. 472; State v. Carroll, 85 Iowa, 1, 51 N. W. 1159; State v. Jones, 106 Mo. 302, 17 S. W. 366; State v. Parsons, 39 W. Va. 464, 19 S. E. 876, and other cases cited in note to Spears v. State (Miss.) 16 L.R.A.(N.S.) 285. Within this rule we think the evidence, apart from the admission of defendant, too attenuated to prove the *corpus delicti*.

The state invokes the rule of State v. Nelson, 91 Minn. 143, 97 N. W. 652; State v. Crawford, 96 Minn. 95, 104 N. W. 822, 768, 1 L.R.A.(N.S.) 839; and State v. Gardner, 96 Minn. 318, 104 N. W. 971, 2 L.R.A.(N.S.) 49. In the first of those cases the present Chief Justice says: "Our examination of the evidence leaves no doubt in our minds as to their guilt, and we are not in the least hampered by the thought that perhaps they are innocent." The perusal of the record in this case creates a grave doubt of defendant's guilt. It is not necessary to point out the particular evidence and

facts giving rise to this doubt. It may also be said that the failure
of the state to place Kaveny on the stand, so that the circumstances
of the confession, if such was made, might be fully disclosed, does
not in any manner tend to set at rest the doubt referred to.

Order reversed and a new trial granted. The warden of the Minnesota State Prison is directed to deliver the defendant to the sheriff
of Le Sueur county to be thence taken for such trial.

HALLAM, J. (dissenting).

I dissent.

Apparently, under the statutes of this state, it is possible for a
person charged with crime to serve a substantial term in the penitentiary before the question of his guilt or innocence is finally determined, but it is usually so unnecessary for him to do so that when a
defendant has served 15 months in the penitentiary this court should
scrutinize very closely the record of his conviction before it holds
that the jury that found him guilty and the court that sentenced him
proceeded without evidence tending reasonably to prove guilt.

In this case the defendant was convicted February 25, 1913. He
was sentenced February 27. Execution of the sentence was stayed.
A transcript of the evidence was obtained and a motion for a new
trial made. This was denied April 29. An appeal therefrom was
perfected April 30, 1913. He might have had his appeal determined
at any time, under Rule 1 of this court, which provides that appeals
taken during term time "may be placed on the calendar by order of
the court when an early decision is necessary to the protection of the
rights of either party." The expense of prosecuting this appeal did
not stand in his way, for the record had been prepared, and the
state guaranteed him "the assistance of counsel in his defense."
Const. art. 1, § 6. But he made no move to bring his appeal on for
hearing, either during the April term or during the ensuing October
term. In October his bondsmen surrendered him to the custody of
the sheriff, and on October 13, 1913, the trial court committed him
to the penitentiary. He did not move even then. The appeal was
not placed on the calendar of this court until April, 1914. Even
then it was continued to the October, 1914, term, at the defendant's

own request. Finally after a delay of more than 18 months from the time the appeal was taken, a delay wholly attributable to himself, and after he had in fact served nearly 15 months of his term, he brings this appeal on for argument and asks this court to determine that there was no evidence to sustain his conviction. This voluntary delay should not deny him his liberty if he is indeed being unjustly punished, but the case should be considered in the light of these facts, for such acquiescence in penal servitude is most unusual in the case of an innocent man. The evidence for the state is not strong, but it appears to me sufficient to support a conviction. There is evidence of a confession by defendant which, if true, fastens guilt upon him. It is true that under our statute there must be proof other than defendant's confession to establish beyond a reasonable doubt the *corpus delicti;* that is, to establish that the barn was burned with criminal design by someone. But the conduct of defendant is evidence proper to be considered upon this point. State v. Laliyer, 4 Minn. 277 (368). The barn was burned in some manner, and it seems to me that, taking all the evidence other than the confession, it is sufficient to prove that it was burned by criminal design. There are no circumstances pointing affirmatively toward either accident or spontaneous combustion. In other cases, with no stronger evidence, proof of the *corpus delicti* has been held sufficient. State v. Millmeier, 102 Iowa, 692, 72 N. W. 275; Davis v. State, 141 Ala. 62, 37 South. 676; see State v. Grear, 29 Minn. 221, 13 N. W. 140. The case was fairly tried. No exception is taken to the charge of the court. This court could not see the witnesses or hear them testify, as did the jury and the trial court, and it appears to me the evidence is such that after this lapse of time and the voluntary acquiescence of defendant this court should not now disturb the verdict.