## STATE v. JAMES ROBERT JOHNSON.

152 N. W. (2d) 529.

August 11, 1967—No. 40,004.

*J. P. Dosland*, for appellant.

*Douglas M. Head*, Attorney General, *Gerard W. Snell*, Solicitor General, and *David C. Weinberg*, Special Assistant Attorney General, for respondent.

PER CURIAM.

This is an appeal from a judgment of conviction in a criminal prosecution in which defendant was charged with murder in the third degree. Minn. St. 609.195. The trial court submitted the lesser included offenses of manslaughter in the first degree (§ 609.20) and manslaughter in the second degree. § 609.205. The jury returned a verdict finding defendant not guilty of the first two offenses but found him guilty of manslaughter in the second degree. The only assigned error of substance relates to the claim that the verdict is not supported by the evidence.

From the record it appears that on Sunday morning, October 25, 1964, defendant went pheasant hunting with his brother, two girl companions, and another friend. They began near Comstock, Minnesota, in Clay County, and moved south along the Red River into Wilkin County near Wolverton. While the three men—defendant, 26; his brother Rodney, 16; and Edward Duklet, 24—hunted out in the fields, the two girls—Nelmar Scrabeck and Joyce Tabatt—drove defendant's black and white Buick east and then north onto County Road No. 51 to a place where they might scare up birds for the hunters.

Presently, a green Ford pickup truck pulled up behind the Buick. The truck was driven by Henning Ljunggren. He was accompanied by his brother Alfred, the deceased, who owned 560 acres of farmland in the immediate vicinity. Henning testified that his brother had posted "No Trespassing" signs on his property, and one of the girls admitted seeing one of these. Whether the younger men were hunting on the Ljunggren property, and if so, with or without notice that they were trespassing, is not clearly determined by the record, but this does not affect the legal implications of the death of Alfred Ljunggren, as all the

incidents leading directly to his death occurred on County Road No. 51 and not on private property.

When the Ljunggrens pulled up behind the girls, Henning Ljunggren approached the Buick and told the girls to leave the area. When they did not leave immediately, he took a gun from the back seat of their car, saying, "I'll hold this till you start moving." Henning testified that one of the girls, Nelmar, got out of the car with a bottle in her hand and demanded the return of the gun. The testimony is in conflict as to whether Henning, with a gun, and his brother Alfred, with a pitchfork, threatened to strike the girls. Nelmar said she was threatened. Henning denied this. In any event the girls did leave the area, Henning first having returned the gun to them.

The girls then drove back to where the three younger men were hunting and told them what had just transpired. The three younger men returned with the girls to where the Ljunggrens were burning weeds in a ditch on County Road No. 51. At this point defendant suggested that the farmer (Alfred) owed the girls an apology, whereupon Alfred brandished a pitchfork and moved toward defendant, threatening him with it. Defendant then took the .22-caliber rifle out of his car, warning Alfred not to come any closer. When it appeared to defendant that he was not going to stop, he fired several shots into the ground in front of Alfred. At least one of the bullets struck Alfred.

Defendant testified that as soon as he began firing, Alfred stopped. The latter then thrust his pitchfork at Duklet, striking him near the eye. Duklet wrested the pitchfork away from Alfred, whereupon Alfred returned to his truck, took out a shovel, and began pounding the hood of defendant's car with it. In the meantime, the youths had gotten into their car. When they drove away from the scene, Alfred was in a kneeling position in the road. It is a strange circumstance that, although the decedent's brother, Henning, was standing nearby in the ditch, he observed nothing of the exchanges between his brother and the youths and heard only the shots and the door of the Buick slam when the hunters were leaving. According to him, everything seemed to happen very quickly. Seeing his brother lying in the road, Henning went to him

and asked if he was hurt. He lifted his brother's head but got no response. Alfred appeared to be dead.

After the youths left the scene of the trouble, they drove to a nearby farm where they called for an ambulance. When assured that the ambulance was coming, they returned to the scene. There defendant admitted the shooting and gave himself into the custody of Sheriff Ellert Wilson. Arthur Overby, a neighbor of the deceased, was at the scene and testified to seeing the pitchfork, the shovel, and a pop bottle lying near where the shooting took place. Dr. Clifford W. Jacobson of Breckenridge, the coroner who examined the deceased, stated that, in his opinion, wounds in both thighs were caused by one bullet; that that bullet lodged near the main bone in the upper thigh of the left leg; and that death appeared to have been caused by a severance of the femoral artery. As a result of the fateful meeting between the two men, one is dead and the other is serving a long prison sentence.

It seems clear from the record that the jury could not reasonably find on the evidence that defendant's acts were felonious in nature or evinced a depraved state of mind, either of which is a necessary element to a finding of guilty of murder in the third degree. Nor does it appear that the evidence would sustain a finding of guilty of manslaughter in the first degree, which finding would comprehend causing the death of the victim in the commission of, or an attempt to commit, a crime with such force and violence that death might be foreseeable. The jury concluded that defendant was guilty of manslaughter in the second degree (§ 609.205), a lesser included offense,[1] frequently referred to as "involuntary manslaughter." So far as applicable here, the statute provides:

---

[1] The finding of guilt in a reduced degree of the offense charged is authorized by Minn. St. 631.14, which provides: "Upon an indictment for an offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment, and guilty of any degree inferior thereto; upon an indictment for any offense, the jury may find the defendant not guilty of the commission thereof, and guilty of an attempt to commit the same; upon an indictment for murder, if the jury shall find the defendant not guilty thereof, it may, upon the same indictment, find the defendant guilty of manslaughter in any degree. In all other cases, the de-

"Whoever causes the death of another by any of the following means is guilty of manslaughter in the second degree and may be sentenced to imprisonment for not more than seven years or to payment of a fine of not more than $7,000, or both:

"(1) By his culpable negligence whereby he creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another."

We are accordingly required to review the record in order to appraise the jury's implicit finding that defendant was culpably negligent in creating an unreasonable risk or in consciously taking a chance of causing death or great bodily harm to the victim.

Defendant asserts the combined defense that he acted in self-defense and, in so acting, did not go beyond an attempt to ward off an attack by reasonable means, and that the death resulted from an accident and not from defendant's culpable negligence. In view of the nature of the defense, certain principles of law should be stated.

The trial court correctly instructed the jury on the law as it relates to self-defense and explained to them the provisions of § 609.06, which provides:

"Reasonable force may be used upon or toward the person of another without his consent * * *:

\* \* \* \* \*

"(3) When used by any person in resisting * * * an offense * * *."

Section 609.06 is part of the new Criminal Code, and the term "reasonable force" contained in it has not been construed by this court. The Advisory Committee Comment, 40 M. S. A. p. 80, indicates that the statute states the present Minnesota law as expressed in State v. Shippey, 10 Minn. 178 (223), and State v. Tripp, 34 Minn. 25, 24 N. W. 290. See, also, Germolus v. Sausser, 83 Minn. 141, 85 N. W. 946. The earliest case, Gallagher v. State, 3 Minn. 185 at 187 (270 at 273),

---

fendant may be found guilty of any offense, the commission of which is necessarily included in that with which he is charged in the indictment."

pointed out that a party attacked may use a sufficient degree of force to prevent an intended blow without retreating but added, "He must, however, take care that he use no more violence than may be necessary to prevent the violence of the assailant." It was said in Shippey (10 Minn. 183 [231]): "The right to defend himself would not arise until defendant had at least attempted to avoid the necessity of such defense." In discussing the use of reasonable force to resist an attack, we said in Germolus (83 Minn. 144, 85 N. W. 947):

"* * * This does not require that the necessity for doing the act must be actual; for it is sufficient if there is either a real or apparent necessity for so doing. But the mere belief of a person that it is necessary to use force to prevent an injury to himself is not alone sufficient to make out a case of self-defense, for the facts as they appear to him at the time must be such as reasonably to justify such belief."

It is a general rule that the legal excuse of self-defense is available only to those who act honestly and in good faith. The rule requires (1) the absence of aggression or provocation on the part of the slayer; (2) the actual and honest belief of the slayer that he was in imminent danger of death, great bodily harm, or some felony and it was necessary to take the action he did; (3) the existence of reasonable grounds for such belief; and (4) the duty of the slayer to retreat or avoid the danger if reasonably possible. 9 Dunnell, Dig. (3 ed.) § 4245; 40 C. J. S., Homicide, §§ 122 and 126; 41 C. J. S., Homicide, § 395, p. 229.

The self-defense asserted by defendant in this case is not presented in the usual posture, as where a defendant, believing himself in imminent danger, kills in self-defense. Implicit in the jury's verdict is the finding that defendant's acts in self-defense were not directed to the killing of his assailant but were intended as a deterrent to discourage or ward off the aggressive acts which might expose him to danger. The jury apparently concluded that defendant, in discharging the rifle at the ground near the area where the decedent was standing or moving, went beyond the reasonable means which were necessary to protect himself, and in so doing he culpably created an unreasonable risk and consciously took

the chance of causing death or great bodily harm. The jury may also have concluded that defendant did not use all reasonable or probable means within his power and consistent with his safety to avoid the danger of the decedent's threatened attack. It is conceded by the prosecution in oral argument that the bullet which caused the fatal wound ricocheted from the ground. It also appears that prompt first-aid measures might have averted the fatal effects of the injury had the scene of the encounter not been charged with emotional and irrational feelings.

In State v. Beilke, 267 Minn. 526, 127 N. W. (2d) 516, we reversed a conviction of manslaughter in the second degree where we felt that the evidence failed to establish beyond a reasonable doubt that defendant was guilty of "culpable negligence." We pointed out that while the conduct there might properly have been found to be negligent, it could not have approached the character of culpable or criminal negligence essential to a finding of involuntary manslaughter. In discussing the meaning of culpable negligence, we said (267 Minn. 534, 127 N. W. [2d] 521):

"* * * It is more than ordinary negligence. It is more than gross negligence. It is gross negligence coupled with the element of recklessness. It is intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others."

The culpable nature of defendant's conduct must be viewed in the context of the facts as they appear in the record. The record recounts the unfortunate meeting of two men who had never before met, with no reason to do each other harm and with little, if any, provocation which would be expected to give rise to the sudden and inexplicable consequences that followed. It is clear that defendant made the first advance by approaching the decedent. However, the decedent had threatened defendant's girl friend and had rudely compelled her to leave the area of his land. The record does not indicate that defendant approached the decedent in an attitude of belligerence, but as a young man whose girl friend had been rudely treated and who, out of a mistaken sense of chivalry, thought something should be done about it. The

undisputed evidence is that when he met the decedent he told him that he thought there should be an apology to the girl. The record indicates that the effect of this statement on the decedent was explosive in that he became infuriated and charged defendant with a pitchfork. According to the record, defendant, who was standing near his car, reached in to the front seat, took out the rifle, and, in order to deter the decedent and after warning him not to come closer, discharged the contents of the rifle into the gravel road. The jury, viewing the senseless and unnecessary consequences of this fatal meeting, were reluctant to find that there was conduct of a criminal nature on the part of defendant. In their verdict of guilty, they volunteered the suggestion that the court should be lenient in its sentence. The trial court, however, ignored the views of the jury and sentenced defendant to the maximum term. We gather from the record that the court was influenced in determining the appropriate sentence by the fact that a man had died. Defendant has been in custody since the day of his arrest, and no action has as yet been taken by the Adult Corrections Commission to mitigate his punishment.

We have held in a long line of cases that where this court entertains grave doubt as to a defendant's guilt, the interests of justice require that there be a new trial. State v. Anderson, 272 Minn. 384, 137 N. W. (2d) 781; State v. Iago, 66 Minn. 231, 68 N. W. 969; State v. Cowing, 99 Minn. 123, 108 N. W. 851; State v. McLarne, 128 Minn. 163, 150 N. W. 787; State v. Steeves, 130 Minn. 53, 152 N. W. 1103; State v. Jacobson, 130 Minn. 347, 153 N. W. 845; State v. Nyhus, 176 Minn. 238, 222 N. W. 925; State v. Wulff, 194 Minn. 271, 260 N. W. 515; State v. Star, 248 Minn. 571, 81 N. W. (2d) 94. See, also, People v. Casillas, 60 Cal. App. (2d) 785, 141 P. (2d) 768. Here, as in State v. Edmons, 132 Minn. 465, 156 N. W. 1086, the record leads to the conclusion that no errors were committed in the trial, and the instructions to the jury are not open to criticism. Nevertheless, a majority of the court are of the opinion that the evidence bearing upon defendant's culpable or criminal negligence is so far doubtful as to require, in the interests of justice, a new trial on the issue of manslaughter in the second degree. The doubt arises from the accidental nature of the de-

cedent's death and the attitude of the jury, whose recommendation of leniency indicated doubt as to the culpability of defendant's conduct.

New trial granted.