## STATE v. JAMES WILBURT BAKER.

160 N. W. (2d) 240.

July 5, 1968—No. 39,093.

---

*C. Paul Jones,* State Public Defender, and *Murray L. Galinson* and *Robert E. Oliphant,* Assistant State Public Defenders, for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Frank T. Gallagher, JJ.

NELSON, JUSTICE.

Defendant was found guilty of second-degree assault following a jury trial in Hennepin County District Court and was sentenced to imprisonment for a term not to exceed 5 years. He appeals from the judgment of conviction and from an order denying his motion for a new trial. The appeal was dismissed on motion July 11, 1966, for lack of prosecution but was reinstated on motion of the public defender July 6, 1967. Defendant seeks to vacate the judgment of conviction and to have the case remanded for a new trial.

The facts are as follows: On November 4, 1962, James Roberts, after attending a party which had lasted from 2 a. m. until 5 a. m., stopped at Cicero's Old Southern Barbecue, an all-night restaurant in Minneapolis, at 6 a. m. While at the restaurant Roberts met Hughella, "Candy," Edwards. Roberts, Miss Edwards, and a third man went to a residence and after about 15 minutes the trio left and Roberts dropped Miss Edwards and the other man off at another address, returning to Cicero's where he was supposed to meet Miss Edwards at a later time.

After Roberts left Miss Edwards, she went to defendant's apartment, awakened him, and asked him to drive her to Cicero's. Defendant and Miss Edwards arrived at Cicero's about 8 a. m. Roberts was parked across the street when defendant and Miss Edwards arrived. Roberts approached them and asked Miss Edwards what she was doing with defendant. Defendant told Roberts it was none of his business and Roberts told defendant that since he had given Miss Edwards $10 he felt that it was his business. The two men exchanged uncomplimentary remarks and then "squared off" for a fist fight. Roberts apparently got in the first

punch and was getting the better of defendant as a result of two well-placed kicks to defendant's groin which sent defendant to his knees. Defendant was bigger than Roberts and had had experience in fighting in the Golden Gloves tournament, but after the second kick to the groin sent him to his knees, defendant removed a 5-inch-blade hunting knife from his pocket.

At this point the testimony appears to be in conflict. Defendant claims that Roberts attempted to take the knife away from him and in the ensuing struggle defendant stabbed Roberts in the back. Roberts claims that when he saw the knife he chose the discreet route and retired from the field of battle. Roberts claims he started running for his car but that defendant caught him and stabbed him in the back.

Mrs. Louise Jones observed the incident and testified at the trial that the two men were moving toward Roberts' car and struggling as if one were trying to break away from the other and that when the two men reached the car, Roberts fell on the back end of it.

The doctor who examined Roberts testified that Roberts had two wounds in his back. One was superficial and near the neck, and the second was in the middle of the back to the left of the spine. The second wound was quite deep and had collapsed Roberts' left lung. The doctor described Roberts' condition as critical.

Defendant was arrested and charged with second-degree assault. At trial defendant's theory was that he stabbed Roberts in self-defense. The jury returned a verdict of guilty of second-degree assault.

The issues appear to be as follows: (1) Did the court properly instruct the jury on self-defense? (2) Does the evidence support the verdict? (3) Was defendant's right to a fair trial prejudiced by certain statements of the prosecution?

 Defendant requested the court to instruct the jury that in exercising his right of self-defense he was not required to retreat but could stand his ground or even pursue his attacker if it appeared reasonably necessary, and that he could do so even though he might more easily have gained safety by retreating. Defendant's request, however, is not in accord with the law of self-defense as set out in State v. Johnson, 277 Minn. 368, 373, 152 N. W. (2d) 529, 532:

"It is a general rule that the legal excuse of self-defense is available only to those who act honestly and in good faith. The rule requires (1) the absence of aggression or provocation on the part of the slayer; (2) the actual and honest belief of the slayer that he was in imminent danger of death, great bodily harm, or some felony and it was necessary to take the action he did; (3) the existence of reasonable grounds for such belief; and (4) *the duty of the slayer to retreat or avoid the danger if reasonably possible.*" (Italics supplied.)

If defendant's requested instruction is viewed in the light of the rule stated in the Johnson case, it becomes clear that the court properly refused to instruct the jury that defendant had no duty to retreat or to avoid the danger if reasonably possible.

After reading Minn. St. 1961, §§ 619.40(3) and 610.05, pertaining to self-defense, the court instructed the jury in part as follows:

"* * * The defendant in this case claims that his acts here were justified because they were made in self-defense. In this case you must decide whether or not Mr. Roberts performed the acts claimed by the defendant, and must then determine whether or not the defendant had reasonable ground to believe that the acts of Mr. Roberts were dangerous to himself. If you find that the defendant had reasonable ground to believe that the acts of Mr. Roberts were dangerous to himself then you must decide whether or not the force used by the defendant to repel any assault, if you find any, was necessary, and whether or not the amount of force used by the defendant was required under the facts as disclosed by the evidence. You are instructed that no burden rests upon the defendant to prove his acts were justifiable, because in self-defense, but to find the defendant guilty you must be satisfied beyond a reasonable doubt that his acts were not justifiable on such ground. You will note that actual danger is not necessary to justify self-defense. If one is confronted with the appearance of peril which arouses in his mind, as a reasonable person, an honest conviction and fear that he is about to suffer death or great bodily harm, and if a reasonable man in a like situation, seeing and knowing the same facts would be justified in believing himself in like danger, and if a person so confronted acts in self-defense upon such appearances

through such fear and honest convictions, his right of self-defense is the same whether such danger is real or merely appearance."

When the facts of the case are viewed in the light of the rule set out in the Johnson decision, the court was eminently fair to defendant in its instruction. It properly placed the burden of proving the lack of justification on the state; informed the jury that defendant could use reasonable means to protect himself; and explained that the threat to defendant need not be actual if defendant reasonably believed that it existed. The court did not tell the jury that defendant had a duty to retreat if possible, as set out in Johnson.

Defendant argues that one who has been attacked may not only "stand his ground" but may also pursue his assailant even though the person attacked might more easily have gained safety by withdrawing from the scene. The state argues that defendant's insistence that this "self-proclaimed license for mayhem is Minnesota law" has recently been rejected by this court in State v. Johnson, *supra*. The Johnson case was a manslaughter case, but the principles of self-defense in felonious assault and homicide cases are not materially different. See, State v. Spencer (Mo.) 307 S. W. (2d) 440, 443.

This court in Johnson, referring to the early case of Gallagher v. State, 3 Minn. 185 (270), upon which defendant now relies, stated (277 Minn. 372, 152 N. W. [2d] 532):

"* * * The earliest case, Gallagher v. State, 3 Minn. 185 at 187 (270 at 273), pointed out that a party attacked may use a sufficient degree of force to prevent an intended blow without retreating but added, 'He must, however, take care that he use no more violence than may be necessary to prevent the violence of the assailant.' "

The state contends that defendant had no intention of quitting—instead, he proposed to become the victor by a violent assault by knife, using the weapon which he conveniently had on his person. As this court observed in State v. Shippey, 10 Minn. 178 at 182 (223 at 230):

"* * * '[T]he instrument employed must bear a reasonable proportion to the provocation * * *.' [Citations omitted.]

"The revenge in this case was disproportionate to the injury, and outrageous and barbarous in its nature, and therefore cannot in any legal sense be said to have been provoked by the acts of the deceased. * * *

 * * * * *

"Where the party has not retreated from or attempted to shun the combat, but has as in this case unnecessarily entered into it, his act is not one of self-defense."

In support of the foregoing principles, see 1 Harper & James, Torts, § 3.11, p. 242; Restatement, Torts, § 65, *comment g;* Prosser, Torts (3 ed.) § 19; State v. Abbott, 64 N. J. Super. 191, 165 A. (2d) 537; United States v. Stahls (S. D. Ind.) 194 F. Supp. 849.

In view of the foregoing authorities we are satisfied that defendant was not entitled to his requested instruction and, indeed, that the instructions actually given were highly favorable to him.

The next question is whether the evidence sustains the verdict. The verdict is totally justified under the facts, since they indicate that the two men engaged in mutual combat after having an exchange of words regarding Miss Edwards; that Roberts was getting the better of defendant; and that defendant resorted to using a hunting knife which he had in his pocket.

It is true that defendant and Roberts tell conflicting stories on the question of whether Roberts was attempting to get away from defendant or take the knife away from defendant when Roberts was stabbed in the back. However, the corroborative evidence and the testimony as a whole indicate that Roberts' account of what actually took place is the more reliable. Mrs. Jones testified that the two men were moving toward Roberts' car at something less than a run and that Roberts fell onto the back of the car when they reached it. Furthermore, the position of the wounds in Roberts' back and the fact that Roberts fell on his car after the stabbing justify the finding, implicit in the verdict, that defendant was pursuing Roberts, caught him, and stabbed him in the back.

Roberts testified that when defendant pulled out the knife Roberts told defendant from a distance of 10 feet to "[p]ut the thing away and fight like a man," and that defendant said, "No. I am going to get you for that." Roberts explained that after he realized defendant intended to use

the knife, he started running toward his car. Roberts further testified that "he ran up behind me. And as I was running he stabbed me in the back."

Miss Edwards testified that before the altercation occurred she was told to go inside Cicero's and did. She claimed that when defendant entered the Old Southern Barbecue he said that "he had stabbed someone or something, and the knife had blood on it." Defendant then took Miss Edwards home. On the way she asked for the knife and defendant turned it over to her. She identified the knife and the scabbard or sheath as those turned over to her by defendant.

Cicero Flood, operator of the Old Southern Barbecue, testified that after the stabbing defendant came to him and said, "I just stabbed a fella." Flood said defendant then "wiped a knife off on the towel" and Flood told him to leave. Flood said that defendant "looked to be in an angry mood." He added that he observed no injuries on the person of defendant.

Officer William Royalty of the Minneapolis Police Department, one of the officers who arrested defendant on the morning of the stabbing, testified that he also saw no injuries on the person of defendant. He said defendant first denied the stabbing and denied being at Cicero's. Officer Royalty testified further:

"* * * And we asked him if he had been with a woman by the name of Candy. And he said, 'Yes.' And we asked him if there was any—if he had had a fight with this Mr. Roberts, and he said, 'Yes.' And we asked him if a knife had been involved in anyway. And he said, 'Yes.' And we asked him if he had held the knife that had done the stabbing, and he said—he says, 'First of all, I'm not going to say a word until you tell me if the guy is dead or not.' He says, 'Is he dead or is he alive?' * * * And then we proceeded to ask him if he had done the stabbing. And he says, 'I'm not saying anything until I find out if the man is alive or dead.' "

Detective Captain Clifford Egeland, who interviewed defendant later that morning, testified that defendant admitted engaging in a fist fight with Roberts and stated that he was "kicked and punched and knocked to the ground twice"; that he then "pulled a knife and stabbed the man in

the back"; and that he "wasn't sure how many times he stabbed him." The officer observed no apparent injuries on the person of defendant.

Detective Wallace Hyvare took defendant's written statement on the morning of the assault. He related that defendant claimed that he and his victim "had words which led to blows. And they fought." The officer testified that defendant further said, "Even though I am a big or bigger than the white man he was too good for me; he was too good with his fists. And he was getting the best of me. And my knife was my only protection. I pulled my knife because that was my only protection."

It appears that defendant made no complaint of injury to any of the members of the police department. He claims Roberts struck the first blow, but admitted that he was a former Golden Gloves boxer and that he consequently knew how to use his fists and had been in fights before. He admitted that he had carried the knife and the sheath on his person at the time of the assault. On redirect defendant testified that when he put on his coat in the morning he did not know a knife was there.

A reading of the record indicates clearly that Roberts' version of the stabbing has a powerful, physical fact in its favor. Roberts was stabbed in the back. Defendant obviously found it difficult to explain how, while supposedly slashing at the attacking victim, he inflicted a knife wound which, as the doctor related, was "in the mid-portion of the back." The jury could well find that it was equally strange that defendant, the victim of Roberts' aggression, had not a scratch on his hands, arms, or the front of his body, although defendant claimed that he was "lashing at" Roberts who, defendant said, was trying "to take the knife away" from him. But even accepting defendant's version that he stabbed Roberts while the latter was attempting to take the knife away leaves ample ground to sustain the verdict of guilty. Under those circumstances, the jury could reasonably have concluded that defendant's brutal assault was grossly inappropriate to the alleged "danger" which defendant claimed he sought to repel.

Likewise, the jury might not have been impressed by defendant's claim that his possession of the sheathed knife was merely by chance rather than by design. The jury might well have viewed with some skepticism defendant's claim he had so readily engaged in a fight with a

stranger over a girl whom defendant maintained he drove to the assault scene merely to get her out of his home. The jury might well have been unimpressed by defendant's story after hearing that he told less than the truth to the arresting officers.

We conclude that the evidence amply supports the verdict of guilty and clearly justified the jury's rejection of defendant's claim that he acted in self-defense.

■ Defendant claims prejudice arising from misconduct on the part of the prosecuting attorney in his opening statement to the jury. Defendant claims that the prosecutor attributed to defendant the statement that he had "stabbed a white so and so." No evidence was introduced that defendant, a Negro, had ever called Roberts a "white so and so," but the owner of the restaurant did testify that defendant had told him that he had stabbed a "fella."

There can be little doubt that a remark appealing to racial prejudice might tend to inflame the minds of the jurors. Furthermore, there would appear to be no useful purpose served by the statement, since the jury itself was able to see the racial difference between defendant and Roberts. However, while the statement would have been better omitted, the rule is that the prosecutor "may outline the facts in the opening statement which he expects to prove" and "[i]f the facts are stated in good faith with reasonable grounds to believe that the evidence to be offered in proof of such facts is admissible, no error is committed." State v. Kline, 266 Minn. 372, 382, 124 N. W. (2d) 416, 423. The state's explanation that the statement attributed to defendant was based on a statement signed by the restaurant owner indicates that the element of good faith was present. Thus, no error was committed.

Defendant also claims that the prosecutor was guilty of misconduct in asking questions which inferred that defendant was a panderer. The state, however, has the right to attempt to prove its theory of the case, motive being one of the elements. Roberts claimed Miss Edwards was a prostitute, and the state attempted to show that defendant was prompted by a pecuniary rather than a noble sentiment when he engaged Roberts in the fight and later stabbed him. Such proof might well tend to cast doubt upon the claim of self-defense.

■ A third claim of prejudicial misconduct is that the state improperly argued to the jury that defendant and Miss Edwards had intended that defendant take the knife with him to use against Roberts. The state contends that this argument was intended to show defendant's knowledge that he had the knife and that he had brought it intentionally. The state is, of course, allowed to argue all reasonable inferences which the facts permit. It was shown that Miss Edwards went to defendant's apartment after arranging to meet Roberts at Cicero's; that she came to Cicero's with defendant; and that defendant then had the knife in his possession. These facts might well support the inferences that defendant knew Roberts would be waiting for Miss Edwards, knew he had the knife, and in fact had deliberately brought it with him. The state's argument thus appears to have been entirely appropriate and merely to have constituted legitimate inferences drawn from the evidence.

However, since the settled case does not contain the final argument, the applicable principle dispositive of this defense claim is as follows:

"* * * The record before us does not contain plaintiff's final argument. Where the settled case does not contain the facts constituting the alleged misconduct of counsel and such misconduct is denied on appeal by counsel against whom such misconduct was claimed, this court is unable to make a ruling concerning the matter, since we are bound by the settled case." Mayzlik v. Lansing Elev. Co. 241 Minn. 468, 478, 63 N. W. (2d) 380, 386. See, also, 1A Dunnell, Dig. (3 ed.) § 350.

Without further comment on the alleged improprieties of counsel, it seems quite apparent from a reading of the record that the triers of fact intelligently recognized the true issues for their consideration and properly returned a guilty verdict which has ample support in the evidence.

■ Defendant complains that the instructions were insufficient because they did not define "dangerous." However, this claim is not before this court, for defendant did not in any way object to the charge for that reason and did not request a definition of the term.

Affirmed.