## STATE v. T. F. McCAULEY.[1]

February 4, 1916.

Nos. 19,238—(1).

**Arson — circumstantial evidence.**

1. On a charge of arson, circumstantial evidence alone may sufficiently establish the guilt of the accused, but the evidence herein is not sufficient to prove beyond a reasonable doubt that defendant is guilty.

**Same — evidence.**

2. On a charge of arson, circumstantial evidence alone may sufficiently establish the *corpus delicti*, but the evidence herein does not prove the *corpus delicti*, beyond a reasonable doubt.

**Rulings of trial court.**

3. Certain rulings made on the trial examined and *held* largely within the discretion of the trial court.

Defendant was indicted by the grand jury of Anoka county for the crime of arson in the second degree, tried in the district court for that county before Giddings, J., and a jury, and convicted. From an order denying his motion for a new trial defendant appealed. Reversed.

*Leeds H. Cutter* and *Lancaster, Simpson & Purdy,* for appellant.

*Lyndon A. Smith,* Attorney General, *John C. Nethaway,* Assistant Attorney General, and *Albert F. Pratt,* County Attorney, for respondent.

SCHALLER, J.

On Friday, the fourteenth of March, 1913, the dwelling house of A. D. Trombley, situated on his farm about three and one-half miles northeast of the city of Anoka, in this state, was destroyed by fire. The fire was first seen between seven and eight o'clock p. m. The house had been vacant for some months prior to that date. Mr. Trombley, who was living in the city of Anoka, had been out to his farm two or three times during the preceding week. He intended to move out and was putting the premises in condition for occupancy. He had hauled out some furniture and

[1] Reported in 156 N. W. 280.

goods, among other things, some window shades and a roll of linoleum, which were placed in the north room of the house. The premises had been occupied by tenants during the previous seven years.

Mr. Trombley had been out to the farm on March 14 and had built a fire in a stove in the house. He was at and around the house until about four o'clock in the afternoon. He went into the house just before leaving for Anoka. At that time there was still some fire in the stove and the temperature of the room was higher than that outside.

The day was stormy. It was snowing and blowing very hard all the afternoon and up to about seven o'clock p. m. When the fire was discovered it was so far under way that the reflection of the flames could be seen at a distance of from one to two miles. No one, apparently, arrived at the house until eight o'clock or after, at which time the house was pretty thoroughly destroyed. The heat had melted the snow all around the house to a distance of about two rods. Some of the people present at the fire observed tracks in the snow near the southwest corner of the house. These tracks led in a southwesterly direction. One witness testified that "the tracks were a little further apart than a person would make on an ordinary walk." Another witness testified that "from the way the tracks were made the person was going at a pretty good gait." Another testified, "I guess he was running, judging by the looks of the tracks," and still another that "He was traveling very rapidly." These tracks were followed for a distance of eight or ten rods, but no attempt was made at that time to trace them farther or to measure them.

Later in the evening, Mr. Trombley, who had been notified of the fire, came from Anoka, and, in company with two others, attempted to follow the tracks which they traced some distance and then lost. They then went down to a bridge crossing a creek where, they asserted, they discovered some tracks, apparently of the same size as those which had been discovered near the Trombley house. The distance from the point where the tracks were lost to the point near the bridge where the other tracks were found was about a quarter of a mile.

Subsequently, and on the next day, Mr. Trombley and two other witnesses resumed their investigations. After they had concluded them and were about to go home, one witness noticed some metal curtain springs in the ashes near the southwestern corner of the house. They also testified

that they saw, at about the same place, the ashes of the roll of linoleum, and in those ashes, the outline of the texture or design of the linoleum. It was between 20 and 25 feet from the place where the curtains and linoleum were left to the place where the ashes and the curtain springs were found. The witnesses had again followed the tracks to the point where they lost them the night before. They then discovered tracks leading toward a haystack. Their examination also led them to believe that certain tracks leading from Trombley's house toward McCauley's had been partly obliterated by driving a team of horses attached to a sleigh over them. The team apparently had been driven up to a point near a certain ditch where it was turned around and driven back over the same road. The defendant's sled was found in his barnyard near the house. He admitted that he had driven along that road in the morning to get some dry poplar wood. Certain tracks were found near and around the sled. Witnesses testified that the impressions near the sled were like the ones previously found near the haystack in the field and near the burned house. The parties went to McCauley's house and rapped but no one seemed to pay any attention to them.

The only attempt to measure the tracks was made by the witness Trombley. On Friday night he measured with a grass stalk or a piece of reed, but he lost the reed. The next day (Saturday) he used a stick with which he measured several of the tracks and testified that the length of the stick corresponded with the length of the tracks. It appears that the snow had drifted somewhat, that it was melting on Saturday morning, and that the tracks were in no place absolutely clean or distinct, except that some of those made near defendant's haystack were clearer than the others. A pair of smooth-soled rubbers and a pair of overshoes, both belonging to defendant, were introduced in evidence. Several witnesses testified that the tracks might have been made by the smooth-soled rubber. One of the state's witnesses made a statement, from which the defense infers that the witness himself made some of these tracks in going home from the fire. The witness who claims to have connected up the tracks is Trombley, but his testimony is somewhat confused and inferential.

An attempt was made to show a motive for the crime. There was testimony that at one time, more than a year before the fire, one of the witnesses for the state, who was Trombley's tenant, grew angry because

defendant had cut certain grass at a point on or near the boundary line between him and Trombley. The witness told McCauley that the hay was cut on Trombley's land and that witness would haul it, which he did. He testified that McCauley did not object to this, and made no remark of any kind, except that when witness said he would haul the hay McCauley might have said "all right." It does not appear that Mr. Trombley took any part in this one-sided dispute or that he knew anything about it. It does not even appear that there was a dispute.

The defendant's house was distant nearly a mile from the Trombley house. He lived there with one Calliway, a man who was quite deaf and who apparently assisted in the farm work. Calliway was not called as a witness on the trial. Defendant was arrested the eighteenth of March and brought before a magistrate and a preliminary examination was had. Both the defendant and Calliway testified at this hearing. The defendant was bound over to the grand jury which convened at the next October term of the district court. The matter apparently was before the grand jury in October, 1913. The indictment upon which defendant was tried was found March 19, 1914, more than a year after the fire.

Defendant was tried at the October, 1914, term of the district court on November 6 and 7, 1914. He was found guilty of the crime of arson in the second degree. A motion for a new trial was made and denied. Defendant appeals.

There are a number of assignments of error relating to the admission of testimony. The other assignments may be reduced to two propositions: (1) That the evidence is not sufficient to prove beyond a reasonable doubt that the defendant committed the crime; (2) that the evidence is not sufficient to prove the *corpus delicti*.

1. The evidence in this case was entirely circumstantial. Some of it consisted of opinions, inferences and conclusions of the witnesses. The evidence as to the distance between the footprints varied. One witness stated that "they were a little further apart than a person would make on an ordinary walk," and yet the length of stride varies in different people on an ordinary walk. Another witness said that the person who made them "was traveling very rapidly." Such testimony is scarcely better than guess work. No one took the trouble to measure or even estimate the distance between these tracks. The length and width of the tracks them-

selves were not measured, except by the witness Trombley who cut a stick and with it measured the length of some tracks, trimming the stick down so that it fitted the impressions in the snow. The sheriff, when he made the arrest, got the defendant's rubbers and overshoes, which were delivered without comment or demur, and were in evidence. Witnesses testified (more than 18 months after the fire) that, in their opinion, the rubbers might make the tracks which they saw. One of the state's witnesses (Peterson) testified that the tracks were larger than either the rubbers or overshoes in evidence. This stick is shorter than the rubbers, and much shorter than the overshoes. The rubbers in evidence are old, smooth-soled and not unusually large—such as are usually worn over No. 8 to 8½ shoes. The overshoes are much larger. There is nothing to distinguish the rubbers or overshoes from dozens of others. It does not appear that there was anything unusual or peculiar about the tracks. The most that can be claimed for this testimony is that between the time of the fire and noon the next day several witnesses believed that they had followed tracks from the burned dwelling to McCauley's barnyard, and that McCauley had driven out toward the northeast and back in an attempt to obliterate some tracks. His explanation was that he started out to get some poplar wood and was deterred by a ditch. Witness Trombley described the condition of the ditch as it was four or five days afterward, but the evidence does not disclose what its condition was on March 15. The same witness also testified that the sleigh tracks were along the natural road which defendant would take to get the dry wood.

The course of the tracks leading from Trombley's house as they were seemingly located by the witness Trombley on the plat, ran southwesterly some 10 or 15 rods. The course thence was southeasterly through Trombley's southeast 40 and into McCauley's northeast 40 to a point almost 15 rods south of McCauley's north line and about the same distance west of his east line, a distance of about 140 rods. Thence they ran northwesterly about 80 rods; thence southerly along a road about 160 rods to McCauley's barn, the entire distance traversed along this line being nearly one and a half miles.

It is possible that defendant could have traveled on foot and against the worst storm of the year from the point where he was met by Mr. Hart at 5:40 p. m. to the Trombley house; broken into the house; lugged from

their places the heavy roll of linoleum, the shades and the inflammable stuff necessary to start the fire; set the fire and gotten it to going so that the house was nearly consumed by seven p. m.

It is possible that he ran away in a southwesterly direction for 10 or 15 rods, then turned at an angle and proceeded southeasterly at an ordinary walk to the haystack, and there remained a short time; thence, still at an ordinary gait, went back northwesterly toward the fire and thence southwardly toward his own home, making a trail like a broad V, and, during part of the time, exposed himself to the hazard of discovery in the flame light. These things are possible. It may be conceded that they are probable; but, even when considered together with all the other evidence produced by the state, they do not prove beyond a reasonable doubt that this defendant is an incendiary, especially not when there is no evidence of ill will or of any adequate motive to induce the commission of a crime. State v. Jacobson, 130 Minn. 347, 153 N. W. 845.

2. The proof that the fire was of incendiary origin depends upon the weight to be given to the testimony that the linoleum and shades were moved from the north room to the place where the metal parts of the shades were observed on the day following the fire. The evidence in relation to the ashes of the linoleum is not very convincing.

If, as the state suggests, the linoleum was used in starting this fire, it would seem that it would be one of the first articles to be consumed. The floor under it would be burned in due course. The ceiling and floor above it would probably be next consumed and their ashes and debris fall down upon the linoleum or its ashes. The upstairs ceiling and the roof would probably be consumed in their turn, the debris would fall and the combustion add to the heat which was burning up the linoleum. Parts of the floors, ceilings and roof must have fallen down in this as in other parts of the building and would probably destroy the pattern in the ashes of the linoleum. It would be a providential accident if, after all this, the ashes of the linoleum remained in such a condition that they could be identified as the ashes of linoleum and nothing else.

The evidence on the part of the state is far from conclusive. There is no adequate evidence of motive. There is evidence that there was fire in the stove in the dwelling house as late as four p. m. An examination of the record leaves us in grave doubt whether the state has established

beyond a reasonable doubt that this fire was the result of a crime rather than an accident. State v. McLarne, 128 Minn. 163, 150 N. W. 787; State v. Jacobson, supra.

Our conclusions seem in harmony with the views of the attorney general, for in his brief the suggestion is made that the facts in this case are quite similar to those in the Jacobson case, supra. In this we concur, but it should be noted that the county attorney who prosecuted the case on the trial and argued it here does not agree with the attorney general.

What is said as to the law in the Jacobson case and in the case of State v. McLarne, supra, is applicable here. There are many points of striking similarity between this and the Jacobson case, as to the tracks; measuring the same; overshoes; the attempt to cover the tracks, and the following of the tracks to within a short distance of the residence of the defendant. We can only reaffirm what is said in the Jacobson case: "Circumstantial evidence alone may sufficiently establish the *corpus delicti* and the guilt of the accused in an arson conviction. The only question is whether the circumstances here adduced prove, beyond a reasonable doubt, the fire to have been incendiary and the accused the author thereof." As already stated, we are not satisfied that the evidence adduced proves beyond a reasonable doubt either the *corpus delicti* or the guilt of the accused.

3. The other assignments of error are addressed to rulings made on the trial; but in view of what has already been said, these errors, if any, are of secondary importance.

The objections were in some instances not sufficiently specific. In other instances the answers were not responsive, and the motions to strike out were not based on that ground. These matters are largely in the discretion of the trial court. We cannot say that the court in any particular instance abused its discretion.

Defendant, perhaps with justice, complains that witnesses indulged in damaging inferences and conclusions. Some of the inferences and conclusions were based on slight foundations of fact, others of them on a vivid imagination only. Witnesses occasionally indulge in conclusions and inferences notwithstanding the warning of court or counsel, but the learned trial court may safely be trusted to prevent any recur-

rence of such conditions and to check any attempt, by witnesses or others, to invade the province of the jury.

Order reversed.