## STATE OF MAINE vs. JESSE C. SCOTT.

### Piscataquis. Opinion June 30, 1921.

*Immediate flight from the scene of the commission of a crime, and silence, and failure to divulge at first opportunity all knowledge of such crime, are but circumstances only, which may be shown, and may be evidence of guiltiness, when weighed with other evidence, but alone are not evidentiary circumstances, as such acts might be prompted by an impulse to avoid arrest or embarrassment, which holds in abeyance the performance of one's duty in the furtherance of justice.*

Proof made that a crime has actually been committed, flight to avoid arrest may be shown in evidence as a circumstance having tendency to prove consciousness of guilt on the part of him who fled. Flight, however, is but a subsidiary inferential fact, counting for much or for little in the balance of justice, as the other evidence in the particular case may weight with it.

On the principle that natural impulse would prompt a person, free to do so, to deny that which another to his knowledge speaks, and he does not intend tacitly to admit, silence, in the absence of adequate actuating reason therefor, may be evidence of guiltiness. Still silence, in the same manner as flight, is nothing but a circumstance.

On appeal by respondent. At the September term, 1920, of the Supreme Judicial Court sitting in the County of Piscataquis, the respondent was jointly indicated with one William Pomeroy, for murder, and they were tried together and both convicted. The respondent filed a motion for a new trial which was denied by the presiding Justice, from which denial an appeal was taken. Appeal sustained. Motion granted.

The case is fully stated in the opinion.

*R. W. Shaw,* Attorney General, and *H. M. Hayes,* County Attorney, for the State.

*M. L. Durgin,* and *W. H. Monroe,* for respondent.

SITTING: SPEAR, PHILBROOK, DUNN, WILSON, DEASY, JJ.

DUNN, J. At the September sitting of this court in Piscataquis, in the year 1920, William Pomeroy and Jesse C. Scott were jointly indicted and together tried for the murder, on March 13 of that year, of one Robert C. Moore, known also as Robert Cudmore. Both were convicted. Scott upon this moved the presiding Justice for a new trial. Appeal from denial of his motion brings the record here.

Counsel argue in behalf of Scott that, growing out of the evidence in the case, and upheld by the authority of reason, is such a doubt as to his guilt, as would cause just and impartial men, sitting oath-sanctioned as triers of fact, to hesitate and pause. The argument instills conviction.

For almost four years immediately preceding the commission of the crime, the murdered man had lived with his wife in a house situate in an unincorporated township called Little Squaw Mountain. This house is some ten rods distant, as it usually is reached by pedestrians, from the Greenville Junction station of the Canadian Pacific Railway. Up the railroad location approximately seven rods, and turning and going therefrom for about three rods, is the accepted way from the station to the lonely site of the Moore home. The main part of this house consists of two rooms, one above the other, each measuring some 12 x 20 feet in size, connected by a staircase leading from the southwest corner. The family sitting or living room is below. In the one above the Moores slept. Opening from the ground-floor room, in the order of their use, is a dining room, a kitchen, and a shed, all of one story constuction. Some three-fifths of a mile from the Moore place, toward and beyond the station, by the traveled route, is the Young Men's Christian Association building.

Acquaintance between Pomeroy and the Moores began soon after the latter had removed to the house. The acquaintance, if it did not ripen into friendship, certainly became well defined. From soon after its beginning, for a period of two years or thereabouts, Pomeroy was a frequent caller. Then he went away from Little Squaw Mountain and the Junction. He was of roving habits. Indolence seems to have been more or less congenial to him. Yet he was not altogether an idler, for he would work as a laborer, in the woods or elsewhere, until he had gathered a little hoard, and then cease from toil until his money was gone. In the course of his wanderings Pomeroy arrived at Boston. There, one Monday two years or so from the

time he left the Mountain and the Junction, he engaged in an employment agency to go to work near Rockwood in this State as a lumberjack. On the same day, and through the same agency, Scott also agreed to labor at the same place for the same employer. These two men did not then know each other. They left Boston by railroad train in the night of that day, as part of a woods-going crew, still unacquainted. Next morning, after the train had stopped at the Portland station, they exchanged glances, and then spoke. Much would a clinical study of their natures likely show them to have in common. And still, there are marked differences between the characters of the two. Scott, like Pomeroy, has roamed. He likewise is thriftless and improvident. But he is the more industrious. He has worked, with slight intervening interruptions, from boyhood on, in and about Boston and Lynn stores, as a teamster in the lumber woods, about livery and racing stables, at odd jobs here and there, on board ocean-plying ships and, let it be recorded, that he volunteered as a soldier in the War with Spain, and afterwards was in the regular army, an honorable discharge ending each military service.

Pomeroy and Scott soon were on intimate terms. Pomeroy, by reason of his distinctive qualities or traits, was the dominating or controlling personality. Neither looked forward with eagerness to performance of the contract he had made, or, at least, Scott so testifies. As the two rode along in the train they mutually agreed to breach their respective Boston given assurances and, when they should have arrived at Rockwood, surreptitiously to leave their fellows. If there were hesitancy on the part of Scott in this regard it was attributable alone to the fact that his impecuniosity stood in prohibitive degree. He so told Pomeroy. Pomeroy replied that he had funds sufficient for them both. So they determined to withdraw stealthily from the company of the others, and to proceed on their own account on another train, to Greenville Junction. Their setting out was not until after dining at a Rockwood hotel, at the expense of the company that had employed them. Arriving at the Junction, between nine and ten of the clock that night, Pomeroy suggested that they go to Moore's, where Scott was a stranger, and there they went. Pomeroy was joyfully received. Indeed, his coming was celebrated by the drinking of copious draughts of a liquor colloquially called and, perhaps, accurately enough designated as, "homebrew." This appellation also was sometimes applied, in satirical

implication, to the Moore establishment itself. Midnight was past when Pomeroy and Scott left. Scott went directly to the Y. M. C. A. for lodging. Pomeroy, at first, went to a former boarding place of his, but shortly he came to the Y, registering by the name of Kelly. In the morning they repaired to Moore's for breakfast. There they loitered away the forenoon; they stayed to dinner; they went down town; back they came to supper; they again remained until late, "talking and drinking home-brew," and then to the Y to lodge. Thus, essentially, the days were whiled, until the fateful night at the end of the week. There were variations, to be sure, but none of them boded good. At noontime on Thursday, while Pomeroy and Scott were eating with the Moores, conversation turned to chicken as an article of diet. Pomeroy announced that he would provide such fowl for food. When it was night he and Scott went after the chickens. They designed to gain them by theft from the caretaker at an inn a mile off. On the way, Pomeroy called at the house of a man named Mike McCarville, and from him borrowed a revolver and cartridges explaining, aside to Scott, that he intended to use the weapon for chicken shooting. Soon after leaving McCarville's, deep, untrodden snow was encountered. At the initiative of Pomeroy they abandoned their purpose, and turning about, went back to Moore's, Pomeroy retaining the revolver. Later they went, as usual, to the Y. M. C. A.

Coming to Saturday evening, the pair came to the Junction, where Pomeroy bought two glass bottles each containing about one pint of whiskey. They drank freely and, not far from ten o'clock, returned to Moore's. Mrs. Moore had gone upstairs before they came. Moore furnished "brew" or "beer" for them, and himself drank of the remaining whiskey that Pomeroy had brought. He invited Pomeroy and Scott to pass the night at his house. His invitation was accepted. A cot for Scott to sleep on was brought in from the shed; Mrs. Moore thrusting clothing for it down the stairs. Pomeroy, when Moore and his wife should have retired for the night, was to occupy a cot in the room with them. Scott's cot was made up. Moore went on his way to bed. While Pomeroy was waiting, he and Scott talked over their plans, the latter stating that he felt to go to an adjoining town in search of work; Pomeroy said that he should remain about the Junction. Fifteen minutes passed. If Pomeroy then meditated the doing of a dreadful deed there was no external

manifestation of it.   He arose from his chair near the foot of the stairway and, hallooing "Already?" or "Are you ready?" proceeded up the flight.   On or near the third tread from the top he stopped and, taking aim, he shot Moore with bullets from the McCarville revolver, inflicting wounds that caused his death the next afternoon. Mrs. Moore also was shot, but not fatally.

At the sound of the shooting Scott made ready to run from the house.   He had reached the woodshed door and was fumbling its catch when Pomeroy came directly from the stairs.   Profanely, swearing and with the evident glee of a boisterous roisterer, Pomeroy expressed great satisfaction at a tragic act accomplished.   He bade Scott obey him and Scott says that he did as he was bidden, being afraid of Pomeroy.   They went into the shed; there Pomeroy reloaded the revolver; thence they hurriedly departed from the shed to the railroad track, Pomeroy following close after Scott and pointing the gun in his direction.   Boarding or jumping a westbound freight train they rode to Jackman, forty miles away, for most of the distance in a gondola coal car.   At Jackman, scantily clad and suffering from exposure to cold and falling wind-driven snow, they were arrested.   Pomeroy denied all knowledge of what had occurred at Moore's; Scott, though present and hearing, neither affirmed nor denied this statement.   Next day, to the deputy sheriff, Pomeroy volunteered the information that four armed men had driven Scott and himself from the Moore house to and onto the train.   Scott was silent; in the concise and graphical phrase of the sheriff's deputy, "he didn't say a word."   More recently, at Greenville Junction, en route to the county jail, Scott talked without reserve to officers whom he personally knew.   He told of the crime, the effort to escape, and where Pomeroy threw the gun, which later was found where he said.   He talked with the officials at the jail; he testified at the trial; none of his stories are materially contradicted; in certain essentials they find corroboration; he sustained himself on the cross-examination.

Pomeroy did not testify as a witness.   What led or tempted his mind, unless it were inherent cruel wickedness accentuated by dissipation, to do foul and midnight murder in that house on the borderland of the forest country, is hard to appreciate.   But, whatever may have motived Pomeroy to the commission of heinous crime, rational interpretation of the record shows that Scott is not otherwise

related thereto than by his presence in the house, his subsequent flight, and his silence.    The State dwells especially on his fleeing and upon his being still or mute.    Proof made that a crime has actually been committed, flight to avoid arrest may be shown in evidence as a circumstance having tendency to prove consciousness of guilt on the part of him who fled.    Flight, however, is but a subsidiary inferential fact, counting for much or for little in the balances of justice, as the other evidence in the particular case may weigh with it. Doubtless many an innocent man, with adversity hovering about and endangering him, has taken to flight to escape the clutches of accusation, and to avoid becoming, as he imagined he unjustly might be made to become, what the master dramatist terms a "fixed figure for the time of scorn to point his slow unmoving finger at."

On the principle that natural impulse would prompt a person, free to do so, to deny that which another to his knowledge speaks, and he does not intend tacitly to admit, silence, in the absence of adequate actuating reason therefor, may be evidence of guiltiness.    Still, silence, in the same manner as flight, is nothing but a circumstance. A situation may readily be conceived in which a blameless man might, for protection real or fancied, wrap himself in a mantle of reticence.

Scott says that what he did and what he failed to do, after the assassinous assault and until he felt his own safety secure, must be attributed to the fear which then obtained within him,—that if he dared do otherwise, he himself would be plunged unbidden into eternity.

The conclusion is inescapable, on the evidence here, that there is a doubt for which valid reason may be given regarding Scott's responsibility for the crime; a doubt which settles and lodges in judgment. Scott's guilt was not established by proof beyond a reasonable doubt, and, therefore, his conviction constitutes injustice.

*Appeal sustained.*
*Motion granted.*