# STATE v. JOHN McTAGUE.[1]

January 12, 1934.

No. 29,582.

[1]Reported in 252 N. W. 446.

450

A. M. Cary, Mark J. McCabe, and S. Segall, for appellant.

Harry H. Peterson, Attorney General, Roy C. Frank, Assistant Attorney General, Ed J. Goff, County Attorney, and William G. Compton, Assistant County Attorney, for the state.

DIBELL, Justice.

The defendant was convicted in the district court of Hennepin county of the crime of arson in the first degree. The indictment alleged that on January 19, 1932, he set fire to a building at 600-602 Seventh street north in Minneapolis and a dwelling house known as 604 Seventh street north, in which dwelling house there were at the time human beings. He appeals from the order denying his motion for a new trial.

■ The defendant claims that the *corpus delicti* was not proved. Under our holdings the proof of the *corpus delicti* requires proof of the burning of the building and proof that the fire was criminally set. State v. McLarne, 128 Minn. 163, 150 N. W. 787; State v. McCauley, 132 Minn. 225, 156 N. W. 280.

■ That the building was burned is not questioned. There is no direct proof that the fire was criminally set. The fact may be proved circumstantially. State v. McCauley, 132 Minn. 225, 156 N. W. 280; State v. Jacobson, 130 Minn. 347, 153 N. W. 845; State v. Burnstein, 158 Minn. 122, 196 N. W. 936; State v. Rosenswieg, 168 Minn. 459, 210 N. W. 403.

■ The burned building was owned by George H. Kaufman. He conducted in it a printing business. He used the basement and the street floor. There was no second floor. In the basement was an automatic oil heater. The fire did not come from the basement. If a fire was there it came from the floor above. On the first floor was a bottle of gasolene. It was covered. There was some type-cleaner. That was covered. The fire came with a terrific explosion, and it emitted dense black smoke. A witness says that "it

looked like a haystack going, fire all over, a roaring furnace." The evidence sustains the view that there was something inside the building to force or feed the fire. As noted later, there is evidence that some substance like turpentine may have been present. The jury could find that it was a criminally set fire. See State v. McLarne, 128 Minn. 163, 150 N. W. 787; State v. Tuomi, 167 Minn. 74, 208 N. W. 528; State v. Rosenswieg, 168 Minn. 459, 210 N. W. 403.

■ Whether there is evidence sufficient to connect the defendant with the setting of the fire is a question not free of trouble.

On January 18, 1932, about 4:30 or 5:00 in the afternoon, the day before the morning of the fire, the defendant bought of a wholesale concern near the Kaufman property 15 gallons of turpentine, 10 gallons in one can and 5 gallons in another, paid for it, and it was put into his Chevrolet sedan in the rear of the wholesale building. About 3:30 in the morning of the next day, January 19, 1932, two men left a waiters' and porters' club on Third avenue south. One of them, Jones, passed the Kaufman building. He saw a man come out of the alley with two cans, a large one and a small one, and put them in a car parked near by. Just after this the explosion occurred. Jones told the officers of the incident. They went to the defendant's car and found two empty cans. These cans were identified as the cans that contained the turpentine which was sold to the defendant the afternoon before. The defendant gave his name as Davis to the officers and gave them a wrong living address. One of them started with him in his auto, the defendant driving, to the police station. On the way the officer saw a gun in the defendant's pocket and attempted to take it from him. A struggle ensued, and defendant regained possession of the gun. Defendant admitted having the gun. He claims that he was beaten severely by the police officers and then was taken to the city jail. The jury might view the action of the defendant in the nature of a resistance of arrest or an attempt to escape. It was not required to take either view.

McTague admits that the two empty cans were the cans which contained the turpentine bought the afternoon previous. His explanation is this: He was a liquor runner. He was bringing

alcohol or moonshine from St. Cloud to Minneapolis. There was a liquor war at St. Cloud. The manufacturers wanted turpentine to put in the mash or product of their competitors so as to ruin it. They preferred not to purchase it at St. Cloud because of fear of detection; so they arranged with him to bring turpentine from Minneapolis. On the evening of the 18th he took the two cans of turpentine to St. Cloud. There the man with whom he dealt, who was known to him as Brown, took his car with the turpentine, went away with it, and returned with 100 gallons of moonshine or alcohol, and with the empty cans. The defendant returned to Minneapolis in the early morning of the 19th, and delivered his car to a man who was known to him as Phillips. The latter took the car, went somewhere with it, and returned it without the alcohol but with the empty cans. If he returned the cans to the party from whom he purchased the turpentine the defendant would get a refund. If the defendant's story is believed he is innocent. The testimony of Jones is important, perhaps essential, to a conviction.

Turpentine of the kind bought by the defendant was taken to the University chemistry department and analyzed by Dr. Reyerson and Dr. Brewer. They gave expert testimony, not upon the question whether the fire was of criminal origin, but upon the properties of turpentine and how it acted when subjected to heat. They said it vaporized quickly, was very inflammable, that water did not react upon it readily, and that the proper way to put out a turpentine fire was by spraying rather than by using a single stream of water. The firemen found the difficulty stated present. The fire did not react to their streams of water, and it was several hours before they had the fire under entire control. This testimony had some tendency to prove that turpentine had something to do with the fire.

The owner of the building, Kaufman, went past the building just after two o'clock in the morning of January 19. No reason is given for his being there. There is no explanation. The fire occurred an hour and a half later. About five o'clock in the morning he was called up by an insurance adjuster. He told him that he was too

nervous to drive his auto downtown and asked him to come and get him; the adjuster did so, and together they went to the fire.

There was no motive shown. How the defendant was to gain by the burning of Kaufman's property is not evident. There was a large amount of insurance upon it. It was not the defendant's insurance. It is not shown that there was overinsurance. It does not appear that he would gain by the destruction of the property and the payment of the insurance. If it had been shown that he was interested in the insurance or was to profit by the burning of the building directly or indirectly or that he had a reason for wanting to do Kaufman harm, the fact would be important. The evidence is that Kaufman and the defendant did not know each other. A showing of motive is not essential. The defendant, if he burned the building, had some reason for doing it. If a motive were shown, the evidence before us would be more forceful.

We have had cited no case at all parallel in its facts. Upon the whole we conclude that the question of the defendant's guilt, though circumstantial, as is usual in arson cases, was for the jury. See 1 Dunnell, Minn. Dig. (2 ed. & Supp.) § 520a, and cases. The fact of flight now to be considered is of some importance.

After he was indicted the defendant gave a fidelity bond for $20,000 to secure his appearance. He forfeited the bond and fled the county and state. Later he was found in New Orleans and returned. He went under an assumed name. It might be found that he resisted arrest or sought to escape before arrested.

Flight before apprehension or after arrest and when on bail is a circumstance to be considered—not as a presumption of guilt, but as something for the jury—as suggestive of a consciousness of guilt; and the same is true of an attempt to escape or resisting arrest or passing under an assumed name. In 1 Wigmore, Evidence (2 ed.) § 276, the accepted rule is stated:

"Flight from justice, and its analogous conduct, have always been deemed indicative of a consciousness of guilt. * * * It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false

name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself."

So flight before arrest may be considered by the jury. People v. Sainz, 162 Cal. 242, 121 P. 922; Collins v. State, 192 Ind. 86, 131 N. E. 390; State v. Scott, 120 Me. 310, 14 A. 159; Bigham v. State, 203 Ala. 162, 82 So. 192; State v. Paisley, 36 Mont. 237, 92 P. 566; Bauer v. State, 99 Neb. 747, 157 N. W. 968. So failure to appear or flight after admission to bail, and forfeiture of a recognizance, may be considered. State v. Cherrington, 34 S. D. 562, 149 N. W. 421; State v. Kesner, 72 Kan. 87, 82 P. 720; Jones v. State, 26 Ga. App. 635, 107 S. E. 166. And so may resistance to arrest or an attempt to escape. Burris v. State, 38 Ark. 221; Carr v. State, 45 Fla. 11, 34 So. 892; Anderson v. State, 147 Ind. 445, 46 N. E. 901; Barton v. State, 154 Ind. 670, 57 N. E. 515. The cases from various jurisdictions are collected in 25 A. L. R. 886. The Minnesota cases are noted in 2 Dunnell, Minn. Dig. (2 ed.) § 2464. They accord in principle. State v. Johnson, 33 Minn. 34, 21 N. W. 843 (defendant offered stolen watch for sale to pawnbroker; fled when requested to wait); State v. Nelson, 91 Minn. 143, 154, 97 N. W. 652 (flight after a crime was committed); State v. Ryan, 137 Minn. 78, 162 N. W. 893 (effort to escape after theft; use of disguise); State v. Maddaus, 137 Minn. 249, 163 N. W. 507 (flight from a stolen auto); State v. Green, 153 Minn. 127, 189 N. W. 711 (failure of a defendant to appear at trial); State v. Rosenswieg, 168 Minn. 459, 210 N. W. 403 (flight from a fire).

The defendant could be thought by the jury to be making an effort to escape at the time he had the altercation in the auto with the officer. About that time he gave the officers a wrong name and later he was in New Orleans under an assumed name.

The state offered evidence of flight at greater length than was necessary and went further than it should have gone. It gave evidence of forfeiture of the bond, of the action of the board of county commissioners, of a reward offered, of expense incurred, of the advertisement of the flight in a detective paper, and perhaps some other matters of similar import. This lengthened the case, but we

do not see that there was substantial harm in it to the defendant. The trial court did not think so, and its judgment is of weight.

■ The defendant had been convicted four times. He had served in the St. Cloud reformatory. He had served twice in Stillwater. He had served once in the prison at Walla Walla. He had made attempts to escape.

The defendant testified in his own behalf. He could have been asked on cross-examination about former convictions, for the statute makes them competent upon credibility. 2 Mason Minn. St. 1927, § 9948; 6 Dunnell, Minn. Dig. (2 ed.) § 10309. He may be cross-examined, as a defendant who is a witness for himself in a civil action, upon collateral matters to affect his credibility and to discredit him. To some extent the state may go into his life. It is said that the defendant, being a witness, cannot assert a right to remain wholly a stranger to the jury; but in a general way the state may show what manner of a man he is. State v. Abdo, 165 Minn. 440, 206 N. W. 933; State v. Nelson, 148 Minn. 285, 181 N. W. 850. The state cannot go so far as to favor or induce a conviction because the defendant is a generally bad man and society should get rid of him, since it has him on trial, irrespective of his guilt of the particular offense charged. This will not do. 1 Wigmore, Evidence (2 ed.) § 57. An exact line cannot be drawn between what is permissible and what is forbidden cross-examination upon collateral matters; and it has come to be recognized as the correct rule that the extent of the cross-examination upon collateral matters is largely discretionary with the trial court. State v. Price, 135 Minn. 159, 160 N. W. 677; State v. Taylor, 144 Minn. 377, 175 N. W. 615; 6 Dunnell, Minn. Dig. (2 ed. & Supp.) § 10307. The state cross-examined the defendant upon his prior life. Naturally enough it was unfavorable to the defendant. Though it might have been restricted, we are unable to say, contrary to the view of the trial court, that the cross-examination went beyond that which was permissible.

Order affirmed.