# STATE v. ALBION B. ROWE.[1]

July 1, 1938.

No. 31,246.

[1]Reported in 280 N. W. 646.

*John C. DeCourcy* and *Doherty, Rumble, Butler, Sullivan & Mitchell,* for appellant.

*William S. Ervin,* Attorney General, *Roy C. Frank,* Assistant Attorney General, *M. F. Kinkead,* County Attorney, and *James F. Lynch,* Assistant County Attorney, for the State.

LORING, JUSTICE.

The defendant was convicted of the crime of murder in the first degree in connection with the death of one Elsie Lange, and appeals from an order denying his motion for a new trial.

On the morning of February 21, 1936, a farmer, William Ott, and his wife, were driving along Larpenteur avenue near the east county line in rural Ramsey county, when they noticed what appeared to be a piece of blanket protruding from a snowbank on the south side of the road. Upon stopping to investigate, Mr. Ott discovered a body, almost entirely covered with snow. The object he and his wife had observed was part of a coat in which the body was clothed. A closer examination, made after the proper authorities had arrived at the scene, disclosed that the body was that of a woman lying face downward, parallel with the road. Removed to the Ramsey county morgue, the body was identified as that of Elsie Lange. A post-mortem examination was made, the resulting findings being described by the deputy coroner, Dr. Heron, as follows:

"Under the scalp there was a diffuse hemorrhage. The temporal bone was depressed on both right and left sides. The depression of the skull was one-half inch on the left side. The temporal bone was broken into a number of fragments. The fracture extended across the base of the skull through the sphenoid body to the opposite sides. Both clinoid processes were fractured. The fracture also extended anteriorly and gave the appearance of both wings of the sphenoid were lifted up. The cribriform plate was fractured and the interior of the nose with the fracture of the base could be seen. A subcoracoid hemorrhage was present over the brain surface but no fluid was found in the ventricle. Left pleural cavity, the fifth, sixth, and seventh ribs in the anterior axillary line punctured the cavity and

lower lobe of lung. The lower lobe of the lung contained 250 cc of blood. There was a puncture of the left lower lobe of the lung. The stomach itself was edematous and water logged. The mucus shows no eroded areas, and contained about 500 cc of blood."

In addition, there were bruises on the left elbow and the back of the left hand and abrasions near the left knee. The examination also disclosed a two-months pregnant condition of the uterus. Dr. Heron testified that Miss Lange lived for about 10 or 15 minutes after receiving her injuries, as the amount of blood found in the stomach could get there only by swallowing, and it would take that length of time to swallow the amount of blood found. Cause of death was determined to be the skull fracture.

The defendant was first questioned on February 22, 1936. He was confined in jail for several days and then released on a writ of *habeas corpus*. During the ensuing months he was questioned at various times by county officials, and on September 3, 1936, a complaint charging him with murder was made. His arrest, indictment, trial, and conviction followed.

This appeal raises the question of alleged errors of law which it is claimed were committed at the trial and whether the verdict is justified by the evidence. The great mass of detailed evidence precludes specific recital of all the circumstances tending to establish the defendant's guilt, and our review of the evidence here shall, as far as possible, be limited to the more prominent evidentiary features of the case which undoubtedly influenced the jury's verdict.

The evidence is sufficient to justify the jury's conclusion that Miss Lange met her death at the hands of a murderer. There is no suggestion of self-destruction, and the circumstances quite definitely preclude such a possibility. Defendant's counsel suggests accidental death from being struck by a snowplow or car. However, this contingency is also fairly negatived, at least enough so as to justify the jury's conclusion of homicide. When found, the body lay in a straight position. It was fully clothed, and the garments were in nearly perfect order except that the coat was slightly off at the left shoulder. The hat and purse were lying together on top of the

body near one of the shoulders. There is evidence that the snow in the snowbank from which the body was removed was hard and crusted and the snow around the body soft, indicating that the hole in which it lay had been dug in the snowbank. Blood was found under the head only. Considering the physical facts, it would seem inconceivable that the body could have been flung to the side of the road by a passing car or snowplow and lain undiscovered until sufficient snow had fallen to conceal it. Furthermore, this possibility is quite definitely eliminated by the fact that the 3½- or 4-foot snowbank in which the body was found was formed by snowplowing done the morning of February 13, at which time the cleared portion of Larpenteur avenue was widened by extensive plowing. Miss Lange was still alive when this took place. When her body was later discovered it lay in this large snowbank and not on top of it. Although snowplows went over Larpenteur avenue again between February 14 and February 21, none of the plowing extended to the width of that done on the 13th, and there is thus no possibility that the body was covered by snow pushed to the side of the road during these subsequent plowings. Dr. Heron testified that some of the marks on the body corresponded to the protruding points or humps on the back of the shovel which the state claims was used by the defendant to commit the crime and concerning which additional reference will be made later in the opinion. Dr. Heron stated further that, in his opinion, the injuries to the body were caused by a number of blows from some blunt instrument. This opinion is substantiated by that of Dr. Kamman, also a medical witness at the trial. All these circumstances oppose the suggestion of accident, and justified the jury in rejecting that theory as to the manner in which Miss Lange met death.

At the time of trial defendant was 59 years old and had been a widower for about three years. He was employed by the Northern States Power Company and had his own home in St. Paul, where he lived with a grown daughter and a Mrs. Harris, his housekeeper. He first met Miss Lange, also a resident of St. Paul and about 25 years his junior, in October, 1935. Thereafter they saw each other

on an average of once or twice a week until the latter's disappearance.

By his own admissions, defendant had a strong motive for committing the crime. He admits that Elsie blamed him for her pregnant condition. She had been bothering him for some time trying to see him, and he was intentionally trying to evade her. She frequently called at his home and office and even sent telegrams trying to arrange to meet him, or, as defendant put it, "commanding" him to do so. She threatened to inform his employer and the world that she was pregnant and that he was responsible.

According to the defendant, the last time he saw Elsie alive was February 10, 1936, when she caught him in his car near his home. He took her for a ride that day, during which she again blamed him for her condition and said that she expected him to marry her. On this occasion defendant informed her that he would not marry her and that she would have to stop bothering him or he would find a way of stopping her. He testified that by this he meant that he would use some legal method to stop her.

In a statement asserted to have been made February 28, 1936, to county officials, defendant stated:

"Incidentally, there were physical conditions, home conditions that did not put the woman [Elsie Lange] in any class that I could think of possibly. Not even the street walkers that are out securing one or five dollars for a meeting at night. She was not even in that class. * * * She was physically filthy, and I just simply had to be half drunk to go through with anything, and it was not until sometime in January that I commenced to realize what was the matter."

Assuming that the defendant made this statement, as the jury could reasonably believe, and that it reflected his true opinion of the unfortunate woman, his incentive to commit the crime with which he was charged was obviously great. Miss Lange was unmarried and the mother of one illegitimate child about 14 years old. The prospect of being forced to marry her and bring her into his home and into contact with his children and friends, as his wife,

would probably become unbearable. Similarly, the probability that his refusal to marry her would result in having his alleged intimacy with such a person disclosed to his family and acquaintances would be equally distasteful. Under the circumstances, it is not unlikely that these alternatives of marriage or disclosure would lead to desperate measures by the accused in an effort to find some way of silencing his accuser.

Defendant testified that the only time he had intercourse with Miss Lange was on the occasion of their last meeting, February 10, which was just three days before Elsie's disappearance, and at which time she had renewed her demands and threats concerning her condition. Apparently designed to weaken the state's evidence of motive, the jury might well have thought that this testimony was not entitled to credit. Defendant's immediate superior at his place of employment, who was quite friendly to the defendant and sought to help him even prior to his first arrest, testified that following discovery of Miss Lange's body the defendant admitted having had sexual relations with her. And the plain implication from the alleged statement of the defendant already alluded to is that he and Miss Lange had been sexually intimate before she became pregnant. There are many circumstances, too numerous to mention, which quite plainly indicate that for some time prior to February 10 their relationship was more than the platonic association of friends. Furthermore, defendant very likely realized that Elsie might have little difficulty in establishing him as the father of her unborn child if she chose to take the proper steps, even though her claim was false. In either event, she could cause him considerable trouble and embarrassment and was threatening to do so. The motive was almost as great in either case, and her planned destruction by the person she accused would not be an unnatural result of the situation disclosed by the evidence.

As will be seen presently, defendant also had ample opportunity to commit the crime with which he is charged. John Bethke, a trucker, testified that about eight o'clock every morning he hauled milk passed the spot where Elsie's body was found and stated that

at this point, on the morning of February 14, he noticed what appeared to be a piece of blanket or coat sticking out of the snow. He testified further that thereafter he observed this same article every morning until after February 21, the day the body was found, following which he no longer saw it. Another witness testified that he saw what looked like a piece of coat protruding from the snow at the same place on February 15. The natural inference from this evidence, if given credence by the jury, is that the article seen by these witnesses was the same piece of coat which attracted the attention of Mr. and Mrs. Ott the morning of February 21 and led to the discovery of the body. Inasmuch as the state claims that the murder was committed on the afternoon of February 13, this evidence, tending to prove that Miss Lange's body was placed in the snowbank prior to the early morning of February 14 is of obvious importance.

As far as the record discloses, Miss Lange was last seen alive about noon February 13, at the courthouse in St. Paul, where she registered with the Minnesota State Employment Service. At approximately the same time, the defendant, who was not working that day, was parked in his car across the street and within half a block of the courthouse. He testified that he had driven Mrs. Harris, his housekeeper, to the Commerce Building located at Fourth and Wabasha streets in downtown St. Paul and had agreed to wait for her while she made a call in the building. He was then to drive her to a card party which she planned to attend in the afternoon. However, it is undisputed that he did not wait for Mrs. Harris to come out of the building. He states that he waited for several minutes and then, having decided that he had missed Mrs. Harris, drove away. The state contends that he either met Miss Lange by prearrangement or else was accidentally discovered by her while sitting in his parked car near the courthouse. The defendant admits having had a phone call from her just before he left home with Mrs. Harris in which Elsie insisted on seeing him. He testified that he told her he was taking Mrs. Harris out and could not be bothered. He denied that he informed Elsie that he was going downtown or would be near the courthouse.

The only account of defendant's actions in the afternoon of February 13, between the time he left downtown St. Paul and about 5:00 o'clock in the afternoon, is his own unsubstantiated testimony, in which he claims that he spent the entire afternoon at home except for a short trip to a drugstore to make a purchase. Of some significance, however, is the fact that defendant made no effort to prove his presence in the drugstore during the afternoon, although he undertook to describe in some detail the clerk who, he says, waited on him. This seems most unusual, since he knew shortly after discovery of Miss Lange's body that he was under suspicion and that proof of his actions on the afternoon of February 13 and thereafter would be of the utmost importance in the event of his prosecution.

It was, of course, the jury's function to determine whether defendant gave a frank and truthful account of himself during the day of February 13. Parts of his testimony do not ring true, and his failure to satisfy the jury that he spent the day as he says he did is not surprising. The fact remains that he did have the opportunity to commit the crime.

In addition to motive and opportunity, there is evidence directly tending to connect the defendant with Miss Lange's death. Following discovery of her body, the surrounding locality was repeatedly subjected to a careful search by Ramsey county authorities in an effort to uncover evidence or clues which might have some bearing on her death. These efforts were without result, however, until after the snow had melted. Then, on April 9, 1936, a deputy sheriff found a small piece of metal from the running board of a car within a few feet of where Miss Lange's body lay when discovered. Taken to the defendant's home, this bit of metal was found to fit into a place where part of the metal molding on the left running board of his car was missing. Defendant was present on this occasion, and, with his consent, the deputies removed the strip of molding from the running board.

Four days after the discovery of the first piece of metal, Sheriff Gibbons found another piece about eight feet from where the deceased's body lay, and this piece also fitted into the molding of

defendant's car. This molding and the pieces found by the authorities are in evidence. The edges of these pieces, somewhat jagged, coincide identically with the edges of the hole in the molding. Defendant's car was impounded by the authorities February 21, the day the body was discovered, and was held for several days. Enlargement of photographs taken during this time clearly reveal the hole in the running board molding into which the pieces later were fitted.

The evidence discloses that the left side of defendant's car was damaged in a collision long before he met Miss Lange. It appears that the molding on the running board was cracked and broken at this time. This undoubtedly explains how pieces of the molding might have broken off at a later time, but there is no credible explanation of how those pieces came to be at the scene of Miss Lange's death. That defendant was familiar with this locality is shown by the testimony of another woman and defendant himself, who both testified that on three separate occasions they were parked in defendant's car at approximately the place where Elsie's body was later found. However, they both also testified that neither of them got out of the car at this spot and that nothing happened which could have caused the pieces to break off the running board molding. Without attempting to state further details, it is enough to note that defendant's efforts to explain away the presence of the pieces of metal at this precise spot are not very persuasive. How the pieces were actually broken off is unexplained and will undoubtedly remain so. The undisputed fact remains, however, that they were found there. They establish his presence at the place where the murder was committed and naturally have a strong tendency to implicate him with Miss Lange's death.

There is evidence from which the jury could find that the defendant was in flight in the fall of 1936. He was questioned at the county attorney's office on September 2 and ordered to report again later the same day. There is also evidence that at this time he knew that it was probable that he would be prosecuted. However, instead of returning to the county attorney's office, as he had

been ordered to do, the defendant left the city. The next day, September 3, the warrant for his arrest was issued.

Defendant went first to his sister-in-law's home at White Bear Lake, Minnesota. From there he went to Wisconsin and spent a night in a haystack. He spent the next succeeding three nights registered under false names in hotels in Duluth, Minnesota; Superior, Wisconsin, and Spooner, Wisconsin. He then started to hitch-hike back toward St. Paul and spent one night on the way under a roadside vegetable stand. He finally caught a ride into St. Paul on a truck on September 9. He rode the truck to the State Fair Grounds in St. Paul and entered the grounds to see the fair which was then in progress. His arrest resulted when he was recognized in the grandstand by a St. Paul police officer. Although the defendant testified that his trip was a "vacation," many of the circumstances are indicative of flight. He knew that his prosecution was almost a certainty and that he was under orders to report back to the county attorney's office. A suddenly decided upon "vacation" of the nature of the one taken by the defendant, at such a time and for an innocent man, would be quite unusual. Furthermore, registering at hotels under false names and spending nights in the open is hardly the conduct of a man on vacation. Instead of taking his car on his trip, defendant chose public conveyances and hitchhiking as his mode of travel. His conduct discloses an abundance of caution to avoid recognition. He says that he did not know that a warrant had been issued for his arrest, but there are circumstances indicating that he knew of the issuance of the warrant. He at least had good reason to know that he was wanted by the authorities. Defendant testified that he returned to St. Paul to see his attorney. He admits that during the return trip he learned that he was wanted in St. Paul for murder. Nevertheless, he rode the truck through downtown St. Paul to the Fair Grounds, and, although his trip was voluntary, he made no effort to get off the truck and go to his attorney or surrender to the police. The defendant was permitted fully to explain the circumstances and reason for his trip. It was for the jury to determine whether his

journey was, as he says, a vacation to get away from the hounding of the authorities or flight. If found to be flight, it was a circumstance to be considered as indicative of guilt. State v. McTague, 190 Minn. 449, 252 N. W. 446.

There is, of course, much more to the evidence than has been outlined here, some of which will be referred to later in connection with other alleged errors assigned. There are conflicts in the evidence of which no mention has been made, but which had to be settled by the jury. Thus, conviction meant the rejection of the testimony of Mrs. Harris that she talked to Miss Lange on the telephone February 17. The record also presents conflicts in the medical testimony and important problems of credibility. Belief in defendant's testimony would make conviction impossible, but there are natural and inherent improbabilities involved seriously affecting the plausibility of his story. He had motive and opportunity, and there were circumstances which tend strongly to connect him with the death. There were no circumstances which the jury was bound to accept which are inconsistent with the hypothesis of guilt, and the jury was instructed to acquit if it found such circumstances to exist. After painstaking examination of the record, our conclusion is that the evidence is sufficient to justify the verdict.

Up to this point, further reference to the shovel, the alleged murder weapon, has been purposely omitted. This instrument was a common iron scoop shovel weighing 6½ pounds. Defendant admittedly had it in his car on February 13. It was taken from his garage by a deputy sheriff on February 26 and was thereafter in the possession of the authorities until the time of trial. As already stated, there is evidence that marks on the body corresponded to the humps on the back of the shovel, and Doctors Heron and Kamman were both of the opinion that the injuries were caused by a number of blows from some blunt instrument. Error assigned on the admission of the shovel in evidence is submitted without argument. However, in view of the testimony of the two doctors, there can be no serious doubt as to its admissibility.

Mr. Dalton, criminologist of the St. Paul police department, testified that he found a few hairs adhering to the shovel which were of

the same conical type, diameter, color construction, and pigmentation as those taken from Elsie's head. He also testified that one hair discovered on the shovel was complete and unbroken from root and bulb to the tip, indicating that the hair had been removed from its owner's head by force and had not fallen out. Error is assigned on the admission of this testimony of Mr. Dalton. The witness stated that his science could not definitely identify the hairs found on the shovel as having come from the head of Elsie Lange or any other particular individual, but that all he could say was that the hair had the same general characteristics as the hair taken from deceased's body. The witness admitted that other persons might have the same type of hair.

The hairs were not discovered on the shovel until several months had elapsed from the time it came into the possession of the authorities. In the meantime it had been handled by members of the sheriff's and county attorney's offices and perhaps many other persons. The claim is now made that under these circumstances the evidence as to the hairs found on the shovel was worthless and too remote and that its admission was improper. It would seem that the objection goes to the weight and not the admissibility of this evidence. However, there is no necessity for deciding the question, because diligent search of the record fails to reveal a single objection made at the trial to the admissibility of the testimony of Mr. Dalton which is now criticized. Defendant is therefore in no position to avail himself of any error which might have been committed in admitting that evidence. State v. Shansy, 164 Minn. 10, 204 N. W. 467.

What has just been said applies in two additional instances where error is now assigned on the admission of certain parts of the testimony of the state's witnesses, the woman with whom defendant parked at the place where the murder was subsequently committed, and Sheriff Gibbons. Defendant permitted this evidence to go into the case and now says its admission was improper. If he considered it erroneous, objection should have been made at the time in order to afford the court an opportunity to rule on its admissibility.

Complaint is made of the exclusion of certain testimony of Mr. Lynch, assistant Ramsey county attorney, and also that of the Honorable Kenneth G. Brill, judge of the district court of Ramsey county. The defense claims that it sought to show by these witnesses that during the June, 1936, session of the grand jury defendant's attorney informed them that if the defendant was indicted his attorney would surrender him to the authorities within 24 hours. The alleged purpose of this testimony was to rebut the state's evidence that the defendant was in flight during his trip out of the city in September, by showing that he was willing voluntarily to surrender if indicted. While no offer of proof was made in connection with the court's ruling, it appears that defendant had already testified that he was not in touch with either his family or attorney during his September trip, and no one knew where he was. Obviously, then, it was impossible for his attorney to produce him within the specified time. Furthermore, counsel's offer in June was made with reference to indictment by the grand jury then in session, whereas the defendant was not indicted until October 9. This was after the alleged flight and his arrest on the murder warrant. There is nothing to indicate that counsel was in any position to produce his client during the time he was on his trip. His statement, made over three months earlier, was thus immaterial, and the offered testimony of Judge Brill and Mr. Lynch rightly excluded.

The remaining assignments of error do not require detailed comment. With the exception of one relating to the charge, they cover matters already discussed. Defendant asserts that the court erred in charging the jury on the state's hypothesis as to the manner in which the defendant met the deceased on February 13, 1936, and the manner in which the murder was committed, and in failing to make a statement as to the hypothesis of the defense that she had been struck by a snowplow or other large object. At the close of the court's charge the record shows that the court inquired of counsel if there were anything that he had overlooked, and to that inquiry counsel for the defendant answered, "No." In that state of the record the defendant is not in a position to press this assignment

of error. Defendant had the benefit of a fair trial, and the record, free from prejudicial error, sustains the conviction.

Affirmed with direction that the sentence imposed by the trial court be executed.